JOHN L. ARRINGTON, JR. and LINDA M. ARRINGTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Arrington v. Commissioner
Docket No. 2561-80.
United States Tax Court
T.C. Memo 1983-673; 1983 Tax Ct. Memo LEXIS 115; 47 T.C.M. (CCH) 270; T.C.M. (RIA) 83673; November 9, 1983. John A. Gaberino, Jr. for the petitioners. Robyn *116 R. Jones, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined deficiencies in the 1976 and 1977 Federal income taxes of petitioners John and Linda Arrington of $4,250.26 and $6,211.00, respectively. After concessions, the only issue for our decision is whether the expenses of petitioners' stock farm at Beggs, Oklahoma are deductible under either sections 162 or 212, [1] or whether they are nondeductible as expenses of an activity not engaged in for profit under section 183. FINDINGS OF FACT Some of the facts have been stipulated and those facts are so found. The stipulation of facts and the exhibits attached thereto are incorporated by this reference.
Petitioners John and Linda Arrington, husband and wife, resided in Tulsa, Oklahoma, when they filed the returns and the petition in this case. During 1976 and 1977 petitioner John Arrington, Jr. was an attorney engaged in private practice with the law firm of Huffman, Arrington, Scheurich and Kihl in Tulsa, *117 Oklahoma. Petitioner Linda M. Arrington participated in the couple's ranching activities and was a housewife in 1976 and 1977. Prior to the petitioners' marriage, Linda had been married to E. C. Mullendore, III for 12 years.Before his death in 1970, Mullendore operated the Mullendore Ranches, which encompassed over 100,000 acres and 10,000-20,000 cattle. Linda was actively involved in the ranching business with her former husband. She read trade publication articles to him, conducted all of his correspondence, and attended business and social meetings with other ranchers.She developed an expertise in judging animals for purchase. She is a member of the Kansas Livestock Association and the National Cattleman's Association. Petitioner John Arrington, Jr. first became involved in cattle ranching in 1968 when he was retained to advise E. C. Mullendore, III about possible Federal court reorganization proceedings. He devoted his attention to the financial aspects of the Mullendore Ranches. After Mullendore's death in 1970 John worked with Linda and the ranch manager Dale Kuhrt to keep the ranches running.Due to circumstances beyond petitioners' control, the ranches went into bankruptcy *118 proceedings in 1972; in 1973 most of the properties were sold at public auction. In 1973, after marrying John Arrington, Linda began to shop for a ranch or a stock farm. Late in the year she learned of a 144-acre farm in Beggs, Oklahoma, a town 30 miles south of Tulsa.Beggs has a population of about 1,500, and is located on a U.S. highway; the farm is on a state road 4 miles west of that highway. Although Beggs is in a fairly depressed area, petitioners saw several advantages in this property: they thought it could be used as a stock farm, and also believed the property could eventually be sold for development. Three factors helped convince petitioners of this potential. First, by 1973 an increasing amount of property between Beggs and Tulsa was being sold to families who wanted to move away from the city. Second, the house had city water, electricity, and gas unlike many properties in the area. Third, the sellers, F. E. and Doris Stanley, owned subdivided property close to the farm upon which a development was already being built. Linda was, however, looking for a stock farm, so before deciding to purchase, petitioners investigated the feasibility of using Beggs for a cow-calf *119 operation. [2] They consulted with Dale Kuhrt, a former manager of the Mullendore Ranches about Beggs and also called upon state agricultural experts to advise them about fertilization. Kuhrt worked with John and Linda in making income and expense projections, estimating the capital requirements for the farm, and generally examining whether it could operate at a profit. [3] Petitioners relied heavily on the raw data Kuhrt provided in drawing up a pro forma operating statement. The pro forma statement estimated annual net income of $5,950 prior to debt service; income after loan payments, however, was expected to be only $175. They expected to have a herd of 70 cows and a 90 percent calf yield each year, i.e. 63 calves. [4] Although calves were selling for 70 to 80 cents per pound in 1973, petitioner based their income projections on a price of 50 cents per pound. Petitioners' estimates of their start-up expenses were quite close to the costs they actually incurred for fencing, fertilizing, seeding, etc. *120 Petitioners' estimated capital requirements included the costs of livestock, equipment, fencing, land improvement and general capital improvements. Over half of the projected $61,000 was for the purchase of 70 cows and four bulls. The land improvement costs included the extensive fertilization necessary to a tame-grass operation. Linda Arrington purchased the Beggs property in December 1973 for $120,000. Sixty-six thousand five hundred dollars of the purchase price was a loan from the Federal Land Bank of Broken Arrow, Oklahoma. The loan was to be repaid over 33 years in annual installments of $5,775. To ensure that the development potential was not undermined, Mrs. Arrington received a 5-year covenant from the seller in which he agreed not to construct housing of less than a specified minimum square footage on the property across the street from the farm. Early in 1974 petitioner Linda Arrington unexpectedly learned of a 5,538 acre ranch in Chautauqua County, Kansas. She purchased this property--the "Sedan Ranch"--for $1,200,000 in April 1974. This was a native grass farm, only partially stocked at purchase. The purchase of Sedan Ranch, combined with other factors, *121 forced petitioners to revise their plans for the Beggs Farm.They went ahead with fertilizing the land, and also made arrangements to fence the pastures. The fences, which are crucial in a tame grass farm, were not finished until late in 1974 because of labor problems, so petitioners had no cattle on the land before that time. Cattle prices were fairly high during this period, [5] and because the Arringtons were short of cash, they postponed purchasing cows to stock the Beggs Farm. In October 1974 petitioners moved some of the herd from the Sedan Ranch to Beggs to use the fescue grass for grazing. This enabled them to save the cost of supplemental feeding [6] at Sedan, and kept the fescue grass from going to waste. In July 1975 the calves were taken back to the Sedan Ranch because the Arringtons had trouble finding experienced and conscientious people to run Beggs Farm. Cattle prices remained quite low, so petitioners kept the calves rather than selling them as they would have under normal market conditions. [7] Forty-six of these *122 yearlings were transferred back to Beggs Farm in December 1975, where they remained until they were sold in October 1976 for $9,000. Market prices for yearlings were still depressed at that time. According to petitioners' Schedule F for 1976, however, the income from that sale exceeded expenses attributable to the yearling operation. Petitioners decided to graze less than 70 cow units--the figure used in their projections--because they were advised that one should not put a full load of cattle on newly planted fescue grass.
The Arringtons never used conventional listing methods to try to rent the house at Beggs Farm; they did, however, ask acquaintances in the Beggs area to watch for a "good solid family" *123 that might be interested in renting it. In 1975 George Harris moved into the back portion of the house. Petitioners were robbed in 1974, and hired Harris primarily as a caretaker; he was not a rancher, so was little help with the cattle. Harris paid no money rental to the Arringtons, but rather received housing in exchange for watching the property and performing a few services. Petitioners did not lease the farm land even after determining that they would be unable to stock it. They believed that the cost of fertilization would exceed potential rentals: the market was so depressed that people were not interested in tame grass cattle operations. They did not try to lease to farmers since the land could not be used as a stock farm once the fields were plowed and prepared for crops. Complete sets of books and records were kept for each of the petitioners' stock farms. Although physical separation of the two ranches made truly integrtated operations difficult, petitioners did attempt to make decisions that would minimize overall expenses. Petitioners did not fertilize the pastures in 1977 because calf prices made it apparent that the farm could not operate at a profit that *124 year. They watched the market, and when it showed no signs of improvement by 1978, decided to sell the farm. The Arringtons had some experience in ranching before buying the farm. Linda had spent many years working with her former husband, and was adept at judging cows for purchase. John knew the financial end of ranching. The petitioners also relied on the advice of Dale Kuhrt, who had spent most of his life living on and managing ranches. Petitioners examined the prospects of a profitable operation at Beggs quite closely before buying, and devoted many hours to their analysis. After the purchase petitioners rarely visited Beggs Farm. John Arrington was there when cattle were moved to or from the farm, and occasionally drove down from Tulsa to look the place over. He also checked in by phone about once per week. Because a full-time ranch manager was never hired, petitioners made all major decisions about operation of Beggs Farm. Petitioners believed that the property in Beggs would appreciate in value, and this was one factor in their decision to purchase. They felt that if they should decide to sell in a few years, the property could be subdivided. Also, the farm was only *125 30 miles from Tulsa on a main highway. Beggs was, however, a fairly depressed area and little development actually took place. Petitioners' farming operations only decreased the cost of holding the land in 1 of the 4 years that Beggs Farm was used for ranching. [8]
Sedan Ranch and Beggs Farm represented the petitioners' first two forays into ranching. Neither farm was profitable during the years at issue, but the situation of the Sedan Ranch turned around in 1979, when petitioners had net profit of more than $60,000. The cows at Sedan Ranch are a "reputation commercial herd," which means that the calves are 30 to 50 pounds heavier than those from adjoining farms, and are sold for a few more cents per pound. Beggs Farm generated losses in all 4 years that it was operated as a stock farm; and 1974 loss was $22,398, and in 1975 petitioners lost $15,650. In 1976, the first year in issue, petitioners had income of $9,436 [9] and deductions of $17,166, [10] leaving a net loss of $7,730. The 1977 loss was $14,778. [11]
*126 The cattle market was depressed from mid-1974 until late in 1978. When petitioners made their income and expense estimates, calves were selling for more than 50 cents per pound. The market dropped drastically in 1974 and 1975--feeder steers were selling at little more than 25 cents per pound in 1975--and prices did not return to the 1973 level until 1978, by which time petitioners had decided to sell Beggs Farm. Linda and John Arrington had significant outside income during the years at issue. John's distributive share from his legal practice was $178,109 in 1976 and $175,804 in 1977. Petitioners also had dividend and interest income of more than $20,000 in 1976 and $9,000 in 1977. Petitioners spent little time at Beggs Farm.During 7 years of ownership they remained overnight five or six times. The farm was neither equipped nor used for recreational purposes; to the contrary the house was furnished sparsely and much of it was closed off to reduce the cost of utilities. In his notice of deficiency respondent disallowed petitioners' 1976 deductions for labor, repairs, insurance, utilities, and depreciation. He also allocated both the income and expenses from the yearlings *127 sold in 1976 to the Sedan Ranch Schedule F. In 1977 the entire "rental loss" [12] claimed for Beggs Farm was disallowed. OPINION Petitioners John and Linda Arrington purchased a small stock farm outside of Tulsa, Oklahoma in December 1973. Before buying they investigated the economic aspects of the farm and also considered the likelihood of appreaciation. Soon thereafter petitioners unexpectedly bought a far larger ranch on the other side of Tulsa. This purchase necessitated reexamination of the best use for Beggs Farm, and influenced its management. The cow-calf operation at Beggs was never profitable; some of the deductions making up the 1976 loss were disallowed, and the entire 1977 loss was deemed unjustified by respondent. The issue for our decision is whether petitioners are entitled to deduct the expenses *128 of, and losses from, this farm on their Federal income tax returns. Petitioners maintain that the farm is a trade or business, and that expenses are deductible under section 162. Alternatively they claim that Beggs was held for the production of income, making expenses deductible under section 212(2) and depreciation under section 167. Respondent contends that the farm is not a trade or business, that it is not an activity engaged in for profit, and that expenses are therefore nondeductible personal expenditures. Respondent relies on section 183 and the provisions of section 1.183-1, Income Tax Regs., in determining that petitioners' farm was an activity not engaged in for profit. We agree with petitioners. Section 162(a) allows taxpayers to deduct all ordinary and necessary expenses incurred in carrying on a trade or business. Section 183 limits deductions arising from activities not engaged in for profit; only those deductions allowable regardless of profit motive *129 and those that do not exceed gross income from the activity are permitted. [13]Section 183(b). Thus petitioners may deduct the expenses of their farm only if they purchased and operated it with an "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. by unpublished order (D.C. Cir. Feb. 22, 1983); Allen v. Commissioner,72 T.C. 28 (1979). *130 Petitioners bear the burden of proving their profitmaking objective. Boyer v. Commissioner,69 T.C. 521, 537 (1977); Rule 142(a), Tax Court Rules of Practice and Procedure. The taxpayer's expectation of profit need not be a reasonable one, but the facts and circumstances must indicate that he had an actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner,supra, See also Golanty v. Commissioner,72 T.C. 411, 425-426, (1979), affd. per order (9th Cir. 1981). Although the taxpayer's subjective intent is the ultimate issue, section 1.183-2(b), Income Tax Regs., lists several objective factors to be used in making this assessment. Among factors to be considered are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer and his advisors; (3) the time and effort expended by the taxpayer; (4) the expectation *131 that the assets may appreciate in value; (5) the success of the taxpayer in carrying on similar activities; (6) the taxpayer's history of income or loss in the activity; (7) the amount of occasional profits; (8) the financial status of the taxpayer; and (9) the elements of personal pleasure or recreation involved. Section 1.183-2(b), Income Tax Regs. None of the nine factors is determinative, nor is a decision to be based on a comparison of the number of factors favoring the taxpayer with the number favoring the Commissioner. Nickerson v. Commissioner,700 F.2d 402 (7th Cir. 1983); Golanty v. Commissioner,supra.Instead, all facts and circumstances must be considered, with more weight given to objective facts than to the taxpayer's own statements of intent. Section 1.183-2(a), Income Tax Regs.; Allen v. Commissioner,supra.
(1): Manner in which the Arringtons purchased, then operated Beggs Farm.
Linda and John Arrington investigated the potential of the Beggs property as a stock farm before buying it in December 1973.John Arrington drew on his own financial *132 experience and also relied on the expertise of Dale Kuhrt in drawing up a pro forma operating statement. They used conservative estimates, and projected a positive, albeit small, cash flow. Their price estimates were very close to the actual costs they incurred. Petitioners heeded the advice of Kuhrt regarding fertilizer and seeds, and also called in state agricultural experts to help determine exactly how to produce the best grass. These efforts went far beyond the often perfunctory steps taken by one who is farming solely as a hobby. Petitioners' decisions after purchasing Beggs were also businesslike and consistent with their profit-objective. They waited to stock the farm because cattle prices were high in early 1974, the farm was not ready, and they were short of cash. Later on the market had dropped so dramatically that the prospects of selling calves at a profit were dim. Rather than stocking Beggs, they used the fescue grass to graze some of the herd from Sedan Ranch, thereby reducing their overall costs. The decision not to sell the calves as planned in 1975, but to keep them another year, was motivated by the depressed market, and by petitioners' belief that prices *133 might rise enough over the year to cover their expenses. In 1977, after 3 years of losses and no signs of an upswing in the market, petitioners stopped fertilizing the farm; in 1978 they put Beggs Farm up for sale. Were petitioners indifferent to the economics of the operation, they would have had no reason to alter their use of the farm in accordance with changing economic conditions.Rather than following their initial plans, petitioners continually modified them in light of changing conditions, and attempted to make the best of an unexpectedly bad situation.
(2) Expertise of the taxpayers and their advisors.
Linda Arrington had spent many years involved in the management of large ranches in Oklahoma, and was particularly talented at selecting quality animals for purchase. John Arrington knew the financial end of ranching through some of his work as an attorney, but had never owned or managed ranches of his own. Petitioners relied heavily on the estimates and advice of Dale Kuhrt, an experienced ranch manager, in drawing up the pro forma operating statement upon which they based their decision to purchase the farm. They also called in soil experts to determine what type *134 of fertilizer was needed to prepare the land for fescue grass. The Arringtons recognized that while they knew a great deal about ranching, they were not experts in all phases of it, and thus sought help from people who were. (3) Time and effort expended by the Arringtons in operating and managing Beggs Farm.
Petitioners did not devote a great deal of time to Beggs Farm, in part because their attention was focussed on the Sedan Ranch. They did, however, make all decisions regarding management and use of the farm since they were unable to hire a full time ranch manager. (4) Expection that the Beggs property might appreciate in value.
Profit includes appreciation, and in some instances the taxpayer may believe that even if the property is not profitable solely as a farm, it may be profitable overall when appreciation is considered. Section 1.183-2(b)(4), Income Tax Regs. The Arringtons believed that the Beggs property would appreciate: it was within commuting distance of Tulsa, had city utilities, and was located close to a growing, albeit still small, *135 subdivision. The energy crisis and changes in the utility services dashed these expectations to some degree, but the property was ultimately sold for a gain of $45,000. [14]
(5) The success of the taxpayer in similar activities.
Linda and John Arrington's only other cow-calf operation was the Sedan Ranch. Although operated at a loss for the first few years, the ranch was very profitable in 1979. The herd at Sedan was a "quality *136 commercial herd," indicating that petitioners knew how to select and raise quality cattle. (6) History of income and losses in the activity.
Beggs Farm was never profitable, although in 1976 farm income did exceed the expenses directly related thereto--fertilizer, feed, supplies, etc. [15] Petitioners' operation at Beggs Farm coincided with a highly depressed cattle market, however, and John Arrington's estimate of his income under more favorable circumstances convinces us that the market had a significant impact on the profitability of the farm. Losses that are sustained "because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as * * * depressed market conditions, * * * [are] not * * * an indication that the activity is not engaged in for profit." Section 1.183-2(b)(6), Income Tax Regs.; cf. Barbour v. Commissioner,T.C. Memo. 1976-85. *137 Nor is a history of losses determinative. See, e.g. Engdahl v. Commissioner,72 T.C. 659 (1979) (activity was for profit despite 10 years of losses); Allen v. Commissioner,72 T.C. 28 (1979) (8 years of losses not determinative). Losses in the early years of operation are quite common, particularly where, as here, significant improvements must be made to the land. Cf. Fields v. Commissioner,T.C. Memo. 1981-550. Because petitioners decided to sell after only 4 years of operation, we do not know whether these losses stemmed from high start-up costs that could have been recouped in later years, or whether they were the result of poor management. Faced with this uncertainty, we cannot conclude that Beggs Farm could never generate the profit the Arringtons predicted. (7) Amount of occasional profits. Petitioners never earned a profit on the cattle operation at Beggs Farm. (8) Financial status of the taxpayers. Linda and John Arrington had significant income from outside sources in 1976 and 1977. They never intended to make a living from the Beggs property. (9) Elements of personal pleasure and recreation.
*138 Petitioners did not use Beggs Farm for recreational purposes. While respondent contends that petitioners purchased Beggs Farm so as to enjoy the "ranching life," the evidence unequivocally contradicts this theory. The Arringtons furnished the house sparsely, never replaced the television after it was stolen, and never installed any recretional facilities. Petitioners stayed overnight five or six times during 7 years of ownership. This can hardly be deemed "enjoying the ranching life." Respondent also emphasizes petitioner John Arrington's statement that some people "like to do a certain type of business even though it may not be as profitable" as evidence that petitioners were looking for pleasure rather than profit at Beggs Farm. Many people are motivated by more than the highest possible yield on their investments. This does not mean, however, that they have abandoned a profit objective entirely. Cf. section 1.183-2(b)(9), Income Tax Regs.
Respondent cites petitioners' failure to rent the house or farmland as evidence that the Arringtons did not intend to derive a profit from Beggs Farm. We do not agree.Petitioners used the land in 1976 to *139 graze yearlings, so could not have rented it that year. In 1977 they chose not to fertilize since cattle prices were so low that they knew they could not cover their costs when the calves were sold. These same constraints made leasing impractical: they would have to charge enough to cover the cost of fertilization, yet no other ranchers would pay that price because the market price for calves was so low. The Arringtons did not lease the land to farmers because once plowed and cultivated, the land could never again be used for pasture. We believe the Arrington's decision to leave the land idle was rational in light of all the circumstances. The petitioners could have tried harder to find a full-paying tenant for the house at Beggs Farm, but we do not think their failure to do so is fatal to their case. The Arringtons purchased a stock farm, not a rental property, and while leasing the house would have helped to reduce their losses, we do not believe they were required to rent the house to demonstrate their intent to profit from ranching. Our analysis of these factors convinces us that petitioners purchased and operated Beggs Farm fully intending to earn a profit. They thought *140 that earnings would be minimal during the early years, and also knew that Beggs Farm would probably never make them rich. Yet "the availability of other investments which would yield a higher return, or which would be more likely to be profitable, is not evidence that an activity is not engaged in for profit." Section 1.183-2(b)(9), Income Tax Regs. Linda Arrington knew no other business as well as she knew ranching, and her decision to reenter the field was rational and businesslike. Petitioners derived no personal pleasure from the "ranching life" at Beggs; they were hardly ever there. While petitioners never operated Beggs in strict accordance with their pro forma operating statement, the changes they made were consistent with a profit-seeking objective when one looks at their overall situation. Petitioners simply concluded that in light of the tremendous drop in cattle prices it was not economically prudent to stock Beggs Farm, and decided instead to use it in conjunction with their Sedan Ranch until the market turned around. When continued use of the farm became unnecessary and uneconomical, petitioners put it up for sale. In light of petitioners' *141 attempts to minimize losses, and to mitigate the effects of factors beyond their control, we conclude that they purchased and operated Beggs Farm with the intent of deriving a profit. The effect of this conclusion is to render the limitations of section 183 inapplicable to petitioners, and to make expenses of the farm deductible under section 162. Due to concessions, Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise noted, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue.↩
2. In a cow-calf operation, a herd of cows is maintained and bred each year. The calves are sold when they are 8 or 9 months old.Usually a few of the better heifers are retained for future breeding. ↩
3. Petitioners planned to use Beggs as a "tame grass" stock farm. The soil was heavily fertilized and fescue grass would be planted on half of the acreage; bermuda grass, which was used for grazing during the summer months, was already planted. On a tame grass farm, each "cow unit" (one cow, her offspring, and the bull to service the cow) required only 2 acres of land; the more traditional "native grass" farms required 8 to 10 acres per unit. The expense projections included the costs of fertilization, planting fescue, and fencing the farm. ↩
4. At trial John Arrington testified that while a "well-managed place" could anticipate that yield, "[m]ost people are lucky to get 80 to 85 [percent]."↩
5. When petitioners drafted their preliminary estimates in 1973, they assumed cows would cost about $500 each. In 1974 they were selling for $600.↩
6. Cattle on a native grass farm such as Sedan Ranch must be supplementally fed during the winter months. Cows on fescue need far less supplemental feed. ↩
7. As noted above, cow-calf operators usually sell their calves at weaning (8 or 9 months) to farmers who feed them winter wheat for about a year. The yearling operators then sell them to the feedlots where they stay for 2 or 3 months before being slaughtered. Petitioners in essence had a yearling operation in 1976.↩
8. In 1976, petitioners earned $9,203 from the sale of cattle. Beggs Farm expenses other than interest, taxes, and depreciation, amounted to only $7,196.↩
9. Nine thousand, two hundred three dollars of this income was attributable to cattle sales. At trial John Arrington introduced an exhibit to show that his 1976 overall loss was due to the depressed cattle market rather than to poor management of the Beggs Farm. Petitioners make a convincing case: at 1976 prices, they netted $9,203 on the sale of 19 steers and 29 heifers; at 1978 prices this same sale would have generated gross revenue of $19,265, or a profit of 2,099 after all deductions. Petitioners' experience at the Sedan Ranch, which showed losses until 1979 when the market finally rose, tends to support their contentions. ↩
10. This included depreciation ($3,900); interest expense ($5,580); repairs ($1,912); seeds purchased ($1,906); utilities ($1,357); and other miscellaneous expenses.↩
11. The 1977 expenses were reported on a "Rent and Royalty Income" schedule. The total deduction was comprised of $10,863 in expenses and $3,915 in depreciation.↩
12. The entire 1977 loss was reported on a Schedule E entitled "Rent and Royalty Income." Petitioner testified at trial that his accountants had decided to use Schedule E rather than Schedule F as they had in the past, and that he acquiesced in that choice. He also stated that no changes in the operation of Beggs prompted the different accounting method.↩
13. The relevant portions of sec. 183 are as follows: SEC. 183. ACTIVITIES NOT ENGAGED IN FOR PROFIT. (a) GENERAL RULE.--In the case of an activity engaged in by an individual or an S corporation, if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section. (b) DEDUCTIONS ALLOWABLE.--In the case of an activity not engaged in for profit to which subsection (a) applies, there shall be allowed-- (1) the deductions which would be allowable under this chapter for the taxable year without regard to whether or not such activity is engaged in for profit, and (2) a deduction equal to the amount of the deductions which would be allowable under this chapter for the taxable year only if such activity were engaged in for profit, but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1). (c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.--For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212↩.
14. Sec. 1.183-2(b)(4), Income Tax Regs. refers to sec. 1.183-1(d) for definition of the taxpayer's activity. That section provides that if property is purchased primarily with the intent to profit from appreciation and the taxpayer also farms the land, the two activities are deemed a single activity only "if the farming activity reduces the net cost of carrying the land for its appreciation in value." Sec. 1.183-1(d)(1), Income Tax Regs.↩ In light of our holding that the farming activity was engaged in for profit, we do not reach the question of whether petitioners engaged in one or two "activities."
15. As noted above, respondent allocated income and expenses of the 1976 yearling operation to the Sedan Ranch. We believe that petitioners correctly included these figures in the Beggs Farm schedule, as the animals were at Beggs Farm during most of the time petitioners owned them.↩