TRUETT E. ALLEN AND BARBARA ALLEN, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 5435–76.    Filed April 2, 1979.

*F. L. Dougan* and *Vincent J. Boyd*, for the petitioners.
*Joan Ronder Domike*, for the respondent.

SIMPSON, *Judge:* The Commissioner determined deficiencies in the petitioners' Federal income taxes of $1,376 for 1971 and

---

$3,209 for 1972. The petitioners have conceded certain issues. The only issue left for decision is whether the petitioners operated their lodge as an "activity * * * not engaged in for profit" within the meaning of section 183(a), I.R.C. 1954.[1]

## FINDINGS OF FACT

Some of the facts have been stipulated, and those facts are so found.

The petitioners, Truett E. Allen and Barbara Allen, husband and wife, maintained their legal residence in New York, N. Y., at the time they filed their petition in this case. They filed their Federal income tax returns for 1971 and 1972 with the office of the Internal Revenue Service, Andover, Mass.

In the early 1960's, Mr. Allen was a regular skier in the Londonderry, Vt., area. During this period, the primary skiing facility in the area was at Bromley Mountain. However, the area was experiencing rapid growth as a ski resort with the development of skiing facilities at Magic Mountain and Stratton Mountain.

Because of the development of the skiing facilities and because of the apparent boom in downhill and cross-country skiing, Mr. Allen believed that there was a demand for overnight lodging during the winter ski season and that a lodge which provided such accommodations would be a viable investment opportunity. In addition to the winter ski season (which extended from December 1 through April 15), a lodge could be rented as a summer vacation home during the summer season (which lasted from July 4 through Labor Day weekend) and as a fall vacation home during the autumn "leaf" season. Because of insects and the mud caused by melting snow, Mr. Allen was aware that he would not be able to rent the lodge from April 15 to July 4.

In January 1964, Mr. Allen purchased the land on which he intended to build a lodge. After investigating various possibilities, he decided to construct the lodge himself, using a pre-cut packaged house. He applied for a mortgage, and in such application, he estimated that his annual gross income from the lodge would be $1,500, that his annual expenses excluding

---

[1] All statutory references are to the Internal Revenue Code of 1954, as in effect during the years in issue.

depreciation would be $200, and that his net income excluding depreciation would be $1,300 annually. He also estimated his annual real estate taxes at $200. On April 15, 1965, his mortgage loan application was approved. The principal amount of the loan, which was $14,400, was to bear interest at 5½ percent and the mortgage was to be repaid commencing October 1, 1965, in monthly installments of $99.07 over a term of 20 years.

In a 35-day period during the summer of 1965, Mr. Allen completed most of the construction of the lodge. It was built on 1.5 acres of land, and it had 5 bedrooms, 3 bathrooms, and could accommodate 12 overnight guests. Mr. Allen obtained a fire and liability insurance policy on the property, and in such policy, he was permitted to use the lodge "for not exceeding 5 rooms for lodging and dining room capacity for not exceeding 10 boarders."

By December 1965, the lodge was ready to be rented and was available for rent from that time to the time of trial in January 1978. The following is a summary of the revenue, expenses, and Schedule C losses generated by the lodge:

| Year | Revenue | Real estate tax | Interest | Depreciation | Other expense | Schedule C loss |
|------|---------|-----------------|----------|--------------|---------------|-----------------|
| 1965 | $400 | $20 | $336 | $2,458 | $3,312 | $5,726 |
| 1966 | 1,408 | 359 | 880 | 4,191 | 4,182 | 8,204 |
| 1967 | 2,007 | 350 | 924 | 3,787 | 3,191 | 6,245 |
| 1968 | 2,782 | 433 | 789 | 2,971 | 3,919 | 5,330 |
| 1969 | 5,225 | 461 | 798 | 2,753 | 4,721 | 3,508 |
| 1970 | 4,125 | 512 | 797 | 2,570 | 3,450 | 3,204 |
| 1971 | 4,350 | 554 | 736 | 2,612 | 3,659 | 3,211 |
| 1972 | 1,381 | 642 | 701 | 2,359 | 4,231 | 6,552 |
| 1973 | 2,250 | 611 | 665 | 1,983 | 2,901 | 3,910 |
| 1974[1] | 3,635 | (1) | (1) | (1) | (1) | (1) |
| 1975 | 4,175 | 648 | 742 | 1,515 | 3,880 | 2,610 |
| 1976 | 3,075 | 650 | 545 | 1,396 | 4,055 | 3,571 |
| Total | 34,813 | 5,240 | 7,913 | 28,595 | 41,501 | 52,071 |

[1]Records of these items for 1974 are not available, although there was a Schedule C loss for that year.

In the 1965–66 ski season, the lodge was rented to family groups. In the 1966–67, 1967–68, and 1968–69 ski seasons, the lodge was a licensed inn offering food and lodging to transients. The inn was operated primarily on a weekend basis, and Mr. Allen managed the inn and cooked and served all meals. In time, Mr. Allen concluded that the lodge could not be operated

profitably as an inn on a weekend basis. Accordingly, for the 1969–70, 1970–71, and 1971–72 ski seasons, the lodge was available for full-season rental. Under this arrangement, a tenant leased the premises from Mr. Allen for the entire ski season for an agreed rent. In addition, the tenant assumed the costs of operating the lodge, such as expenses for fuel oil, electricity, snow removal, and telephones, for the term of the lease. Though this rental arrangement proved more successful than the weekend operation, the petitioners continued to lose some money on the operation of their lodge; there was a significant reduction in the demand for the petitioners' lodge because there was very little snow in that area during those years and because many other lodges were constructed in the area during those years.

In response to the declining demand for full-season rentals, Mr. Allen offered short-term leases during the 1972–73 and 1973–74 ski seasons. However, because of the weather, competitors, and the gasoline shortage in 1973 and 1974, Mr. Allen's rental revenue decreased dramatically. Most of the people who skied in the Londonderry, Vt., area came from New York City, Boston, and Hartford; but dwindling gasoline supplies and the concomitant lines at gasoline stations discouraged all but the most devoted skiers from traveling to Vermont.

Since 1965, the lodge has also been offered on a weekly or multi-weekly basis as a summer or fall vacation home. During the 8-week summer seasons from 1965 through 1976, Mr. Allen managed to rent the lodge a minimum of 2 weeks and a maximum of 5 weeks each year. It was difficult to secure summer rentals except for the last 2 weeks in August. Also it was very difficult to obtain fall rentals because generally people were only interested in short-term or overnight accommodations which were provided by the local motels.

Since 1965, the petitioners have taken extensive measures to rent the lodge. They advertised it for winter and summer rentals in the New York Times, Saturday Review, Vermont Real Estate, and Time, Inc. The lodge was also listed with real estate brokers and agents in the area for the purpose of securing rentals.

For the most part, repairs, maintenance, and cleaning were performed by Mr. Allen. However, on those occasions when he was unavailable, Mr. Allen hired two neighbors to perform such services. The petitioners have never used the lodge for personal

purposes. They remained in the lodge overnight only when they were there for business purposes, i.e., cleaning, repairing, or preparing it for use by a tenant. On occasion, the petitioners vacationed or skied in the Londonderry, Vt., area; however, they rented a room from their neighbor on an annual basis for those occasions. In addition, although the petitioners reside in New York City, they also own a home on Long Island where they spend weekends throughout the year. They do not offer such home for rent.

At the time of trial, the lodge had a fair market value of approximately $45,000, and the petitioners' capitalized costs of such lodge were approximately $25,000 to $30,000. Mr. Allen expects to continue to rent the lodge in the future, but he would consider selling it for the right price.

At the time of trial, Mr. Allen was employed as vice president and manager of the Southern Department of the Financial Institutions Banking Division of Irving Trust Co. Since 1965, he has held a substantially similar job with the Irving Trust Co. Prior to joining the Irving Trust Co. in 1962, Mr. Allen attended Harvard Business School from 1960 to 1962, and he was employed by the Federal Reserve Bank of Richmond, Va., from 1954 to 1960. Mr. Allen received compensation of $27,666.71 in 1971 and $29,500.08 in 1972 from Irving Trust Co., and Mrs. Allen received compensation of $25,000.08 in 1971 and $27,833.32 in 1972 from Grey Advertising, Inc.

On their Federal income tax returns, the petitioners deducted losses of $3,211 in 1971 and $6,552 in 1972, resulting from the operation of the lodge. In his notice of deficiency, the Commissioner disallowed such losses because he concluded that the lodge was an activity not engaged in for profit.

### OPINION

The only issue to be decided is whether the petitioners' operation of their lodge was an "activity * * * not engaged in for profit" within the meaning of section 183(a). Section 183(a) provides the general rule that if an individual engages in an activity, and "if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." Section 183(b)(1) provides that deductions which would be allowable without regard to whether such activity is engaged in for profit shall be

allowed. Sec. 1.183–1(b)(1), Income Tax Regs. Section 183(b)(2) provides that deductions which would be allowable only if such activity is engaged in for profit shall be allowed "but only to the extent that the gross income derived from such activity for the taxable year exceeds the deductions allowable by reason of paragraph (1)." Section 183(c) defines an activity not engaged in for profit as follows:

(c) ACTIVITY NOT ENGAGED IN FOR PROFIT DEFINED.—For purposes of this section, the term "activity not engaged in for profit" means any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212.

Section 183(d) provides that, if for any 2 of 5 consecutive taxable years, the gross income derived from such activity exceeds the deductions, the activity shall be presumed to be engaged in for profit unless the Commissioner establishes to the contrary. Because the lodge has operated at a loss since 1965, such presumption is not in effect in this case.

The standard for determining whether an individual is carrying on a trade or business so that his expenses are deductible under section 162, or whether an individual is engaged in activities for the production or collection of income or for the management, conservation, or maintenance of property held for the production of income so that his expenses are deductible under section 212, is: did the individual engage in the activity with the predominant purpose and intention of making a profit. *Dunn v. Commissioner*, 70 T.C. 715, 720 (1978); *Churchman v. Commissioner*, 68 T.C. 696, 701 (1977); *Jasionowski v. Commissioner*, 66 T.C. 312, 319 (1976); *Benz v. Commissioner*, 63 T.C. 375, 383 (1974). Although the taxpayer's expectation of profit need not be reasonable, it must nevertheless be a good-faith expectation. Sec. 1.183–2(a), Income Tax Regs.; *Dunn v. Commissioner, supra* at 720; *Churchman v. Commissioner, supra* at 321; *Benz v. Commissioner, supra* at 383.

Section 1.183–2(b), Income Tax Regs., lists some of the relevant factors, which were derived principally from case law, to be considered in determining whether an activity is engaged in for profit. *Boyer v. Commissioner*, 69 T.C. 521, 537 (1977), on appeal (7th Cir., July 7, 1978); *Benz v. Commissioner, supra* at 382–383. Such factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the

taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved.

The issue is one of fact to be resolved not on the basis of any one factor but on the basis of all of the surrounding facts and circumstances. Sec. 1.183–2(b), Income Tax Regs.; *Dunn v. Commissioner, supra* at 720; *Jasionowski v. Commissioner, supra* at 319; *Benz v. Commissioner, supra* at 382. The burden of proving the requisite intention is on the petitioners (*Boyer v. Commissioner, supra* at 537; *Benz v. Commissioner, supra* at 382; *Johnson v. Commissioner*, 59 T.C. 791, 813 (1973), affd. 495 F.2d 1079 (6th Cir. 1974), cert. denied 419 U.S. 1040 (1974); *Sabelis v. Commissioner*, 37 T.C. 1058, 1062 (1962)), and on this record, they have carried their burden. See *Coors v. Commissioner*, 60 T.C. 368, 409–410 (1973).

There are a few factors which support the Commissioner's position that the petitioners were not motivated by profit considerations. For example, a history of *unexplained* losses over an extended period is persuasive evidence of the absence of a profit motivation. See, e.g., *Boyer v. Commissioner, supra* at 538; *Churchman v. Commissioner, supra* at 701; *Bessenyey v. Commissioner*, 45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). Similarly, the facts that the petitioners had substantial independent sources of income which permitted them to sustain the losses and that Mr. Allen was highly qualified in business matters support the Commissioner's position. Nevertheless, the factors favoring the opposite conclusion convince us of the petitioners' bona fide intent to make a profit.

Before purchasing the land and constructing the lodge, Mr. Allen familiarized himself with the skiing industry in and around Londonderry, Vt. It was readily apparent to him that the continued success of the facilities at Bromley Mountain and that the development of Magic Mountain and Stratton Mountain ski facilities spelled the beginning of dramatic growth in downhill and cross-country skiing in the area. With these facts in mind,

Mr. Allen concluded that there was a market for a lodge providing overnight accommodations, and he spent a good deal of time investigating various construction alternatives for the lodge.

Once the lodge was completed, it was operated in a business-like manner. The petitioners kept adequate books and records for the lodge, and they placed advertisements in several newspapers and listed the property with local real estate agents and brokers in their efforts to generate summer and winter rentals.

Despite such efforts, the petitioners incurred substantial losses. However, the losses are adequately explained by several conditions. First, other investors quickly entered the market for seasonal lodging in Vermont, with the result that the marketplace soon became saturated with similar lodges. In addition, several years of below average snowfall and the gasoline shortage in 1973 and 1974 caused the rental income from the lodge to decline dramatically. Such conditions bring this case within the terms of the statement in section 1.183–2(b)(6), Income Tax Regs., that:

If losses are sustained because of unforeseen or fortuitous circumstances which are beyond the control of the taxpayer, such as drought, disease, fire, theft, weather damages, other involuntary conversions, or depressed market conditions, such losses would not be an indication that the activity is not engaged in for profit. * * *

Due primarily to the continuing losses, the petitioners experimented with different modes of operating the lodge in hopes of producing a profit. Initially, they rented the lodge to family groups. When that arrangement proved unsuccessful, they operated the lodge as a licensed inn providing overnight accommodations and dining facilities for weekend skiers. Though this proved to be more successful than their earlier arrangement, it did not produce a profit. Therefore, the petitioners began accepting full season rentals. However, because of the weather and the gasoline shortage, the petitioners had difficulty renting the lodge for the entire ski season; they were forced to accept weekly or monthly rentals. As stated in section 1.183–2(b)(1), Income Tax Regs.: "A change of operating methods, adoption of new techniques or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive."

Although the petitioners have sustained substantial current losses, they still hope, in the long run, to realize a profit because the fair market value of the lodge has appreciated to approximately $45,000. The appreciation in value may, or may not in fact, offset the aggregate operating losses, but the prospect of realizing a profit on the sale of the lodge was bona fide when Mr. Allen decided to invest in the lodge and is sufficient to explain his willingness to continue to sustain operating losses. Sec. 1.183–2(b)(4), Income Tax Regs. Moreover, the out-of-pocket expenses graphically demonstrate that part of the losses were economic losses and not merely tax losses.

Most importantly, the petitioners have established that they never used the lodge for their own personal enjoyment. Only in connection with the management of the lodge did the petitioners stay in it overnight. At all times, the lodge was either rented, available for rent, or being prepared to be rented. Thus, it offered them no recreational benefits.

Finally, renting a lodge is not an activity which by itself would cause a taxpayer to derive the kind of personal pleasure or gratification which could supplant a profit motivation. See sec. 1.183–2(b)(9), Income Tax Regs. Similarly, there are no elements of personal pleasure, including aesthetic or other benefits, inherent in such activity.[2]

In summary, based on all of the facts and circumstances in this case, we are convinced that the petitioners intended to derive a profit from renting their lodge. Accordingly, we hold that the losses incurred in such activity in 1971 and 1972 are fully deductible.

Because of concessions by the petitioners,

*Decision will be entered under Rule 155.*

---

[2] The Commissioner did not challenge the reasonableness of any of the expenses for which petitioners claimed deductions, and accordingly, that issue is not before us.