RONALD ZIEGLER and LEONA ZIEGLER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HARRY SCHWARTZ and IRENE SCHWARTZ, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ziegler v. Commissioner
Docket Nos. 977-83, 1032-83.
United States Tax Court
T.C. Memo 1984-620; 1984 Tax Ct. Memo LEXIS 56; 49 T.C.M. (CCH) 182; T.C.M. (RIA) 84620; November 28, 1984. Ronald Ziegler and Harry Schwartz, pro se. David M. Kuchinos, for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: This case was assigned to and heard by Special Trial Judge Joan Seitz Pate pursuant to section 7456(c) and (d) of the Internal Revenue Code of 1954, as amended, General Order No. 8 (81 T.C. XXIII) (1983) and Rules 180 and 181, Tax Court Rules of Practice and Procedure.[1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE PATE, Special Trial Judge: Respondent determined deficiencies in petitioners' Ronald and Leona Ziegler's 1979 and 1980 Federal income taxes in the amounts of $20,410 and $155,477 respectively. Additions to the tax were asserted under section 6653(a) in the amounts of $1,021 and $7,774 respectively. Deficiencies were also determined in the 1979 and 1980 *59 Federal income taxes of Harry and Irene Schwartz in the amounts of $16,021 and $3,230, respectively. No additions to tax were asserted on the Schwartz' returns. After concessions, the issues for decision are: (1) whether each petitioner is entitled to deduct losses sustained in connection with his purchase and distribution of a romance novel; (2) whether an investment tax credit is allowable in connection with the purchase of the book properties; and (3) whether Ronald and Leona Ziegler are liable for additions to tax under section 6653(a) for negligence or intentional disregard of the rules and regulations. FINDINGS OF FACT
Ronald and Leona Ziegler are husband and wife and filed joint Federal income tax returns for the years 1979 and 1980. Leona Ziegler is a party to this suit solely by reason of her having filed joint returns with her husband. They resided in Huntingdon Valley, Pennsylvania both at the time of filing their tax return and at the time of filing their petition. Harry and Irene Schwartz are husband and wife and filed joint Federal income tax returns for the years 1979 and 1980. Irene Schwartz is a party to this suit solely by reason of her having filed *60 joint returns with her husband.They resided in Philadelphia, Pennsylvania both at the time of filing their tax returns and at the time of filing their petition. Petitioners' motion to consolidate these cases was granted on April 1, 1983. For purposes of clarity, Ronald Ziegler shall hereinafter be referred to as "Ziegler", Harry Schwartz shall be referred to as "Schwartz", and both Ziegler and Schwartz shall hereinafter be referred to collectively as "petitioners." For the taxable year 1979 each of the petitioners claimed a schedule "C" loss of $13,481 in connection with his book activities. Additionally, for that year, each petitioner claimed a tentative investment tax credit of $26,000. Ziegler used his investment tax credit to the extent of $18,830 and Schwartz used $14,144 of his. For the taxable year 1980, each petitioner claimed a schedule "C" loss of $11,000 [2] and carried over his unused investment tax credit. Petitioners are attorney practicing law together as a partnership. The law partnership of Ziegler *61 and Schwartz collected a very large fee during the summer of 1979. [3] Consequently, it was anticipated that their taxable income would be unusually large for that year. Moreover, collection of this fee made cash available for investment. For these reasons, Ziegler called their partnership's certified public accountant (hereinafter referred to as "CPA") and requested that he recommend investments for their consideration. The CPA recommended several types of investments including, among others, a real estate venture, an oil and gas venture, as well as the transaction involved in this case (hereinafter referred to as the "Macfadden transaction"). Ziegler became particularly interested in the Macfadden transaction because it involved the purchase of a romance novel and his daugher was an avid reader of these books at the time. The offering was made by Jonathan T. Bromwell and Associates, Inc., of New York, an investment broker (hereinafter referred to as "Bromwell"). [4] Prospective investors were invited to purchase *62 one or more "romance oriented literary properties" to be published as one of the "Macfadden Romance" line. In this connection petitioners were given a document entitled "Summary of Investment." It described "a collection of original romance literary properties designed for acquisition and investment by sophisticated individuals and corporations who seek: (1) potential future income, (2) substantial immediate tax savings (4.7 to 1 equivalent writeoff) and (3) no recapture." This document briefly reviewed the business of publishing romance novels, the purchase price of the books offered, the terms of the transaction, various reprints of articles which "emphasized both the profits being realized in the publishing industry as well as the soaring prices which must be paid to acquire the literary works of experienced and inexperienced authors," representations of the value of the book properties by various unnamed appraisers, an illustration of anticipated Federal tax benefits, and a list of titles of books from which to choose. Absent from this document was any representation or projection of the income, expenses, net income or cash flow (other than tax benefits) which an investor might *63 expect from the investment. Petitioners also received a brochure (hereinafter referred to as "brochure") entitled "Macfadden Romances an offering by the Monroe Anthology, Inc., (hereinafter referred to as 'Monroe') in association with Jonathan T. Bromwell and Associates, Inc." [5] This brochure included sample documents of a commitment agreement, a negotiable promissory note, a security agreement, a services agreement, a list of physical properties, titles and authors, a purchase and assumption agreement, an opinion as to prospective federal income tax consequences issued by a New York law firm, an acquisition agreement, an author's contract, and a non-negotiable promissory note. Ziegler read the documents, checked the reputation of the law firm rendering the tax opinion, met and discussed the Macfadden transaction with the tax attorney representing Bromwell, was assured that the national distributor listed on *64 the front page of the brochure, Curtis Circulation Company, was a major distributor in the field, [6] and was assured by his CPA that Bromwell and the firms they did business with were "reputable people." The CPA reviewed the documents from an "accounting point of view" and told petitioners that the Macfadden transaction had a "potential gain" and "some immediate tax benefit." He did not estimate, however, how many years it would take for either petitioner to realize anything on his investment nor could he remember how many copies of the book would have to be sold in order to realize such a profit. Petitioners were assured by Bromwell that the transaction had been used in several prior promotions and that it was a "common transaction." [7]
*65 On December 7, 1979, each of the petitioners signed a commitment agreement with Monroe to purchase certain "book properties." The term "book properties" was described in the Services Agreement. It included: The Properties with respect to each Work consist of a number of engraved plates and/or lithographic films, each embodying forms of either 32 or 16 pages of the text of the work and other pages to be included in the printed book; four color processed engraved lithographic films embodying the front cover art work for the printed book; and four color processed engraved lithographic films embodying the spine and back cover art work for the printed book, it being understood and agreed that no original artist's rendition is included in the above. According to the commitment agreement, Ziegler purchased such properties with regard to a book entitled "Forgotten Melody" and Schwartz purchased the book properties of "Let There Be Love." The purchase price of each was $260,000 payable $14,000 in cash, $11,000 by way of a recourse note due February 1, 1980 and the assumption of a non-recourse obligation of $235,000. Each of the petitioners paid the $14,000 on December 7, 1979 and paid *66 $11,000 on his recourse note in the beginning of 1980. In summary, the transaction was to take the following form. Kim Publishing Corporation (hereinafter referred to as "Kim" or the "publisher") purchased a manuscript (herein referred to as the "book" or the "work") from an author for a fixed price plus royalty based on future sales. This purchase included the sole and exclusive right to copyright, sell, license or otherwise dispose of the book. On October 25, 1979, (in an "Acquisition Agreement"), Kim sold each of the book properties to Monroe for an undisclosed amount of cash [8] plus a $235,000 non-negotiable, non-recourse promissory note bearing simple interest at the rate of 6% per annum, payable October 1, 1988. This note was secured by a "Security Agreement" providing that principal and interest on this note were payable out of one hundred percent of the proceeds derived and received from the exploitation of the book properties for a "specified" number of copies, and sixty percent of the proceeds thereafter. The number of copies for which one hundred percent of the proceeds was to be applied was never specified. The non-negotiable non-recourse notes executed by Monroe *67 were the notes assumed by each petitioner when they purchased their respective book properties. Petitioners also received a Services Agreement with Ave Distributing Corp. (hereinafter referred to as "Ave Distributing" or "services contractor") in which the services contractor agreed to print, warehouse, and distribute the books for a period of nine years. The services contractor warranted to print, bind and have available for distribution for retail sales to the public no less than 100,000 copies of the book prior to December 31, 1979. Before entering into the Macfadden transaction, petitioners neither read the books they were to purchase, nor inquired into the reputation of either author, his or her qualifications, or previous literary history, nor did they seek any independent advice concerning the values of their books, nor did they check any independent sources to ascertain specific business facts regarding Kim, Monroe or Ave Distributing. In the Commitment Agreement, petitioners acknowledged *68 receipt of various documents including the Services Agreement to be entered into between petitioners and Ave Distributing. Copies of these documents submitted at trial revealed that the date was not filled in on the Services Agreement and it was never executed by petitioners. Further, the Purchase and Assumption Agreement, between each petitioner and Monroe did not show the names of the book properties purchased. In addition, petitioners did not check to see if the book properties existed, that Kim had legal title thereto, or when Kim had contracted with the authors to acquire their rights. After making their payments, petitioners' roles in the venture were relatively inactive. They never viewed the physical properties which they had purchased, were not aware of any advertising used to promote their books, did not inquire as to why the number of books printed did not conform to the contract (although they were aware of the lack of distribution) and did not complain to the parties about their failure to live up to the terms of the contract. Petitioners were aware, however, that one hundred percent of the proceeds derived from the exploitation of the books would be applied against *69 the non-recourse note, until a "specified" number of copies were sold. Since the documents did not specify the number of copies of the books that had to be sold prior to petitioners' receiving any cash, their CPA was concerned and inquiries were made. They were informed that although the number of copies was not specified, there was to be an accounting for all of the sales and proceeds thereof. At no time prior to trial were petitioners informed as to how many copies of their respective books would have to be sold before they would start receiving cash distributions. During 1979 and 1980, the president of both Kim and Ave Distributing was Henry McQueeney (hereinafter referred to as "McQueeney"). During those years McQueeney was also employed by Manor books. The three companies were owned and controlled by the same people.Manor Books was a mass market publisher of paperback books that included novels, gothics, westerns, mysteries and so forth. Kim was set up to distribute romance novels under the name Macfadden Romances. Kim published approximately twelve books ("titles") a month. Schwartz' commitment agreement named the book he was purchasingas "Let There Be Love" by Marcy *70 Hall. This book was published under the name "Let This Be Love." It was, in fact, written by Judith Smith under the pseudonym, Nicole DeLyn. [9] In October of 1979 the author first supplied Kim with a synopsis of her story. She submitted the complete manuscript in late December of 1979 and contracted with Kim to sell the book on February 5, 1980. The book was distributed as No. 187 of the Macfadden Romance series in June 1980. The book stated that it had been copyrighted in 1979 by Kim. Pursuant to hisCommitment Agreement, Ziegler purchased a book entitled "Forgotten Melody" by Diane Winston. A book, entitled "Tangled Dreams" was later substituted therefor. The author of "Tangled Dreams" first submitted her manuscript to Kim in late August, 1980, using the pseudonym, Suzanne Clifton. After revisions, she signed a contract with Kim in March, 1981. The contract provided that she was paid $1,000 for her manuscript and was entitled to a six percent royalty after the book grossed $10,000. She never received the $1,000 advance royalty. The book was distributed as No. 299 of the Macfadden Romance series in 1981. *71 The book stated that it had been copyrighted in 1979 by Kim. When the Macfadden line was originally started, initial print orders were for 50,000 copies per title. After approximately six or eight months, the original print orders were increased a bit and then started dropping. The amount of the original print order was based on the number of copies ordered by solicited wholesalers.The books were put out in "pre-packs." Each pack would contain six of each of twelve titles. Kim printed 30,000 copies of "Let This Be Love" of which 10,117 copies were sold. The balance were returned to the publisher. Five hundred copies of "Tangled Dreams" were printed, 300 were sold and 200 remained in the warehouse. Despite the fact that the written contracts called for an initial printing of 100,000 copies, McQueeney testified that 100,000 copies were not printed because they had not received orders for 100,000 copies at that given point in time. No one title of the Macfadden line ever sold one hundred thousand copies. No individual title was advertised. Rather, advertising was directed toward the Macfadden line. Advertising was done through TV commercials, radio spots and ads in trade *72 journals. Kim spent approximately $50,000 to $60,000 a year in advertising. The retail price of "Let This Be Love" was $1.25 per copy and the retail price of "Tangled Dreams" was $1.50 per copy.The wholesale distributors received approximately sixty-three percent of the retail price leaving the publisher thirty-seven percent. According to the promotional material given petitioners by Bromwell, Macfadden Romances were to be distributed by Curtis Circulation Company, but the actual contract was with Ave Distributing. Negotiations were started with Flynt Distribution Company (herinafter referred to as "Flynt"), for Flynt to take on the Macfadden Romance line. Flynt took over as distributor as of January 1, 1980, but the arrangement did not last long. Litigation with Flynt began in early 1981 because Flynt was not paying promptly. As a result of this litigation, distribution was discontinued. Petitioners were unaware of this litigation until September 1983, approximately one to two weeks before trial. Each year petitioners received from Bromwell information necessary to prepare their respective tax returns. For the year 1979, each petitioner received an accounting which showed: *73 gross receipts of $11,000; a deduction for the cost of printing and shipping of $11,000; [10] depreciation in the amount of $32,444; and an investment tax credit of $26,000. For the year 1980, each petitioner received an accounting which showed: no gross receipts; depreciation in the amount of $50,568; and the balance of his investment "at risk" of $11,000. They turned this information over to their CPA who used it in the preparation of their respective income tax returns.The losses deducted on Schedule "C" were limited to the amount "at risk." Neither petitioner has ever received any return on his investment in the MacFadden transaction. A great deal of expert testimony was presented at trial regarding the history of the paperback romance novel, the publishing industry and the fair market value of the books purchased by petitioners. All of the experts agreed that valuation of an original romance novel which would initially be published in paperback was not *74 dependent upon the literary merit of the individual book. These romance paperbacks was basically "formula" books; their plots followed a basic story line. They primarily were distributed, not through book stores, but rather through thousands of supermarkets, drugstore chains and convenience stores. They basically appealed to people who were "non-readers" and supplemented and gradually replaced the romance magazine. Because the sale of any individual book was dependent upon its exposure to the public, the primary factors in evaluating how many copies of an individual book might sell depended upon the public's recognition of the line and the number of outlets available to the distributor of the line. [11] Statistics show that mass market paperbacks sold between seven hundred million and seven hundred and fifty million books per year during the years in issue. "Bantam" was the largest selling paperback line, constituting approximately one-sixth *75 of the total market. "Dell" had approximately one-eigth of the market and "Pocketbooks" around one-tenth. Seven or eight publishers controlled seventy percent of the market. Macfadden Romances had a market share of approximately one-tenth of one percent of the total. Macfadden Romances was just being launched as a remance paperback series in 1979. "Harlequin" was the dominant romance line at the time. Both of petitioners' experts were of the opinion that it would take the sale of approximately 541,000 copies of each individual book in order to produce the amounts necessary to return petitioners' purchase price. However, neither of them knew how that number was arrived at. The number had been supplied by Bromwell. One of petitioners' experts stated that chances of any individual title of a romance paperback selling 500,000 copies or more were "infinitesimal." One of petitioners' experts stated with regard to each of the books: I forsee that revenues from the exploitation of this book may at least meet the purchase price, and in fact, are quite likely to exceed it after deduction of all costs under the services agreement." The other of petitioners' experts stated: I *76 project that revenues from exploitation of this book over a period of nine years will at least meet the purchase price, and, in fact, may well exceed it after deduction of all costs under the services agreement. Both of the opinions expressed above relate to revenues less costs under the services agreement. Neither of petitioners' experts expressed any opinion as to the net income to the investor which might be derivedfrom these books, nor expressed an opinion as to the fair market value of either book. One of respondent's experts estimated the fair market value of "Let This Be Love" at $3,300 and "Tangled Dreams" at $4,900. The other of respondent's experts estimated the value of each of the book properties at $3,286. When respondent first audited petitioners' tax returns, he disallowed their claimed Schedule C losses and their investment credits. In addition, with regard to Ziegler, respondent adjusted his 1980 income by adding back $235,000 as "constructive discharge of indebtedness." Petitioners' CPA met with the Internal Revenue Service on the original audit and on at least three separate occasions. Each time, in addition to objecting to the disallowance of the losses *77 and the credit, he pointed out that with respect to Ziegler the adjustment for "constructive discharge of indebtedness" was cumulative and inconsistent. Despite these objections, respondent refused to concede the $235,000 adjustment to Ziegler's 1980 income. In fact, respondent did not concede this issue until just before trial. Consequently, the following deficiencies in tax were shown on the Notices of Deficiency: Name
1979
1980
Schwartz
$16,021
$3,230
Ziegler
20,410
155,477
Ziegler contends that, because he is not conversant with Federal income tax matters, he needed expert assistance in preparing this case. He alleges that, because of the extremely large deficiency asserted against him, he estimated the cost of tax counsel at between $20,000 and $30,000, an amount which he felt he could not afford. However, he never did attempt to hire an attorney. OPINION Petitioners in this case argue that the Macfadden transactions were bona fide investments and, therefore, their losses and investment credits should be allowed as claimed. Alternatively, Ziegler contends that respondent's inconsistent and cumulative adjustments to his 1980 *78 income created a tax deficiency to large that he was denied his right to due process of law under the Fifth Amendment and, therefore, respondent should be estopped from pursuing his deficiencies. Respondent argues several alternative positions. First, with regard to Schwartz' year 1979 and Ziegler's years 1979 and 1980, respondent contends that Kim had not purchased the manuscripts for the books during those years and, consequently, the book properties could not have been in existence. Therefore, no depreciation or investment credit would be available. Second, respondent contends that the Macfadden transaction was not an activity entered into for profit and, therefore, losses and the investment credit attributable thereto are not available. Third, respondent argues that the non-recourse note was not a bona fide obligation and, therefore, should not be added to basisfor purposes of computing depreciation or the investment credit. Finally, respondent contends that the value of the intangible property (copyright) must be segregated from the cost of the tangible property (book properties) for purposes of computing both the investment tax credit and depreciation. Due Process
*79 Before deliving into the substantive issues of this case, we first must consider Ziegler's argument that respondent should be estopped from asserting any deficiency in this case because his Notice of Deficiency was so erroneous as to deny petitioners due process of law guaranteed by the Fifth Amendment of the United States Constitution.Ziegler complains that respondent issued a Notice of Deficiency which erroneously adjusted Ziegler's 1980 income by adding $235,000 as "constructive discharge of indebtedness." No such addition was made to Schwartz' income. Ziegler contends that the inordinately large deficiency resulting from this adjustment prevented him from obtaining competent tax counsel. Respondent seeks to explain away this adjustment to Ziegler's income by stating that "respondent simply relied upon alternative grounds in setting forth its deficiency in the case of petitioners Ziegler." Although respondent certainly is entitled to plead alternative legal arguments, we do not see how that justifies repeatedly adding back the same item of income for each such alternative position. This adjustment clearly is duplicative of the loss disallowance. Despite these facts, however, *80 we think that respondent's actions fall far short of denying Ziegler his right to due process. Petitioners were advised by their CPA that the adjustment was included to protect respondent from a "whipsaw" and therefore, was merely an alternative position. Having been informed of this as early as the audit level, they had adequate time to counter respondent's action. [12]
Most importantly, petitioners *81 have failed to show that they were damaged or prejudiced at trial because of respondent's actions. Although Ziegler claims that hiring expert tax counsel would have cost him an extraordinarily large fee because of his inflated tax deficiency, he admits that he never attempted to engage anyone to represent him. We note that both petitioners are practicing attorneys in their own right, and even conceding that the tax issues in this case are complex, we are not convinced that their own case would have been handled differently in any material aspect by an attorney specializing in Federal income taxes. Further, absent any evidence that they in fact could not hire an attorney, we view petitioners' statement that they could not do so as mere conjecture. Petitioners cite Riland v. Commissioner,79 T.C. 185 (1982) in support of their position. In that case we observed that the Tax Court provides a de novo proceeding and "absent substantial evidence of unconstitutional conduct on respondent's part which would impugn the integrity of this Court * * * we generally will not * * * examine respondent's motives or procedure leading to his determination." *82 Riland v. Commissioner,supra at 201. The record simply does not reveal any conduct on respondent's part which may be deemed unconstitutional. Although petitioners may have preferred that the adjustments on respondent's Notice of Deficiency be reflected in a manner other than as presented, no particular form is required. Jarvis v. Commissioner,78 T.C. 646, 655-656 (1982). The requirements of section 6212(a) are met if the Notice of Deficiency sets forth the amount of the deficiency and taxable year involved. Scar v. Commissioner,81 T.C. 855, 860-861 (1983). We have found no constitutional questions involved herein which justify an exception to this rule. Greenberg's Express, Inc. v. Commissioner,62 T.C. 324, 328 (1974). Consequently, we must reject Ziegler's claim that he was denied due process. [13]
Year of Deductionand Credit
Respondent *83 asserts that the manuscripts of the books purchased by the petitioners were not completed during 1979 as claimed by petitioners.Consequently, no "book properties" could have been manufactured that early, and without the book properties in existence, respondent maintains that the evidence shows that Ziegler is not entitled to any investment credit or depreciation in either 1979 or 1980, and Schwartz is not entitled to such credit and depreciation for 1979. [14]
A review of the evidence shows that, with regard to Ziegler, although he originally contracted with Monroe to purchase a book entitled "Forgotten Melody", that book was never acquired by Kim. It follows, therefore, that despite the language of the contracts, Kim could not manufacture or sell the book properties of "Forgotten Melody" to Monroe, *84 and Monroe could not have sold them to Ziegler. Another book by the name of "Tangled Dreams" ultimately was substituted.The author did not complete the manuscript of "Tangled Dreams" until August 1980 and did not sell it to Kim until March 1981. Therefore, the book properties could not have been conveyed to Ziegler until 1981. With regard to Schwartz, the original documentation showed that he purchased a book written by Marcy Hall entitled "Let There Be Love." The actual book published was written by Judith Smith and entitled "Let This Be Love." The author sold the manuscript to Kim in 1980. Consequently, no valid transfer of the book properties could have been made to Schwartz prior to 1980. Section 167 provides a deduction for depreciation of a tangible asset used in a trade or business or the production of income. The deduction is allowed to the taxpayer who suffers the economic loss for the exhaustion, and wear and tear of the asset. Weiss v. Wiener,279 U.S. 333 (1929). Generally, that person is the owner of the property. *85 Northwest Acceptance Corp. v. Commissioner,500 F.2d 1222 (9th Cir. 1974), affg. 58 T.C. 836 (1972). Legal title alone, however, is not controlling. See Kinzler v. Commissioner,T.C. Memo. 1962-62. Depreciation is allowable only to that person who will bear the loss reflected by such depreciation. Helvering v. F. & R. Lazarus & Co.,308 U.S. 252 (1939). Further, the deduction for depreciation is first available in the year the asset is "placed in service." Section 1.167(a)-10(b), Income Tax Regs.; Wisconsin Psychiatric Services, Ltd. v. Commissioner,76 T.C. 839, 853 (1981); Cooper v. Commissioner,T.C. Memo. 1975-320. In other words, the asset must actually be used in the income-producing activity before a depreciation deduction is available. The facts show that the book properties of "Tangled Dreams" could not have been manufactured by Kim prior to 1981. Therefore, Ziegler could not have acquired any interest, legal or equitable, in such book properties in either 1979 or 1980. For the same reason, Schwartz could not have acquired any interest in the book properties of "Let This *86 Be Love" in 1979. Lacking such an interest, petitioners could not have sustained any economic loss in those years with regard to such assets. Further, since the book properties of "Tangled Drems" could not have been manufactured prior to the completion of the manuscript in August of 1980, and could not have been used until the author sold her rights to the book to Kim in 1981, they could not have been "placed in service" until 1981. Since Ziegler did not acquire and place in service the book properties of "Tangled Dreams" until 1981, we find that no depreciation expense may be deducted by Ziegler for 1979 and 1980. For the same reasons, we find that Schwartz is not entitled to any depreciation for the book properties of "Let This Be Love" in 1979. Section 38 provides an investment credit for a taxpayer's qualified investment in certain property "with respect to which depreciation * * * is allowable." Sections 46(a) and (c); 45(a)(1). Since we have determined that Ziegler did not have an interest in 1979 and 1980 in any book properties upon which depreciation would have been allowable during those years, it follows that he also is not entitled to any investment credit during *87 those years. For the same reason, we find that Schwartz is not entitled to any investment credit for the year 1979. Activity for Profit
The pivotal issue for our determination is whether petitioners entered into the Macfadden transaction with an objective of making a profit. The issue is one of fact to be determined from the fashion in which the activity was pursued. Allen v. Commissioner,72 T.C. 28, 34 (1979). Section 183(a) states the general rule that if an individual is engaged in an activity, and "* * * if such activity is not engaged in for profit, no deduction attributable to such activity shall be allowed under this chapter except as provided in this section." [15] The test for determining whether an activity is engaged in for profit under section 183 is whether the individual engaged in the activity with an "* * * actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. by unpublished order (D.C. Cir., Feb. 22, 1983). The taxpayer's expectation of profit need not be a reasonable one,but there must be a good-faith objective of making a profit. Section 1.183-2(a), Income Tax Regs. *88 ; Allen v. Commissioner,72 T.C. at 33. The regulations set out nine relevant factors that bear on this determination. Briefly, these factors include: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether the elements of personal pleasure or recreation are involved. Section 1.183-2(b), Income Tax Regs.No one factor is controlling in making this determination. Section 1.183-2(b), Income Tax Regs.; Allen v. Commissioner,72 T.C. at 34. Petitioners bear the burden of proving that their objective in entering into the Macfadden transaction was to make a profit. *89 It is sufficient if the taxpayer has a bona fide objective of relaizing a profit, regardless of the reasonableness of the expectation of profit. Allen v. Commissioner,72 T.C. at 33; Dunn v. Commissioner,70 T.C. 715, 720 (1978), affd. 615 F.2d 578 (2d Cir. 1980). A review of all the evidence in this case leads us to conclude that petitioners did not have an actual and honest objective of making a profit. There are many factors brought to light with regard to the offering made by Bromwell which would lead us to this conclusion. For instance, petitioners are both attorneys and it would be natural for them upon entering a multi-party transaction, for a substantial sum of money, which was to extend over a nine year period, to insist that the contracts and other documents be internally consistent, properly completed, signed and delivered. Here petitioners could not produce a completed set of documents which evidenced their participation in this venture. The documents actually produced omitted dates, numbers, signatures, titles or verifications. Even the president of Kim could not produce signed copies. It seems to us that two attorneys *90 who actually and honestly intended to establish a long-term relationship to publish books for which they supposedly had high expectations would check the documentation to assure themselves that everything was in order. An important factor in our evaluation with respect to whether petitioners actually intended to realize a profit from the Macfadden transaction was the format of the promotional materials themselves. The materials emphasized the tax benefits availabl to the investor. Specifically, these materials promised that an investment credit would provide the investor an immediate tax credit which would more than equal the cash investment in the venture. In addition, losses would be deductible, resulting in additional tax benefits that, for a relatively high-income investor, would result in an above average "return" through tax benefits alone. This Court is aware that there are many ventures which legitimately allow investors substantial "front-end" tax benefits. See Frank Lyon Co. v. United States,435 U.S. 561, 583-584 (1978). However, to realize such tax benefits the venture must be entered into with the objective of eventually realizing a profit, which *91 ultimately will be taxed either as ordinary income or long-term capital gain. See Brannen v. Commissioner,78 T.C. 471, 505-507 (1982), affd. 722 F.2d 695 (11th Cir. 1984). It has been held on numerous occasions, however, that a transaction structured to realize tax benefits in excess of the investment and without an objective of obtaining any economic gain from the investment itself, is not an "activity entered in for profit" under section 183. E.g., Baron v. Commissioner,83 T.C. 542 (filed September 26, 1984); Hager v. Commissioner,76 T.C. 759, 785 (1981); DeWoskin v. Commissioner,35 T.C. 356 (1960); Goodstein v. Commissioner,30 T.C. 1178 (1958), affd. 267 F.2d 127 (1st Cir. 1959). Stated another way, the anticipated "profit" cannot be from tax benefits but must be a "profit" realized from participation in the marketplace. The promotional materials received by petitioners from Bromwell contained extensive explanations of the tax benefits to be realized by the investor but did not contain any type of projection to show that the activity would eventually produce *92 either cash flow or taxable income. No representation was made by Bromwell or any other of the participants in this venture that petitioners would ever receive any cash return. No projection of either gross revenues or net income appeared in the promotional material for either the initial year or any subsequent year. No estimate of cash receipts or disbursements was included to show cash flow either in the initial year or any subsequent year. This was true even though the contracts were to last for a total of nine years. Moreover, petitioners were aware that the contracts provided they would not receive any cash return until a "specified" number of copies of the books were sold. Any investor with an actual objective of profit would have been vitally interested in knowing how many copies of the book would have to be sold prior to initiation of cash payments to him. Yet, in this case, the number of copies that were needed to be sold before cash distributions would start was omitted from the contracts. Petitioners noted this omission in the original documents and inquired about it. They were assured by the promoter that they would receive accurate reports of all books sold. *93 Although an assurance that he would receive reports of all books sold certainly would be comforting to an investor, it would not supply one iota of information from which he could project when and if he would receive any cash return on his investment. Without this information, there would be no way of evaluating when or under what circumstances he would make a profit. Failure to obtain these financial projections is even more surprising in view of the fact that neither the petitioners nor their CPA had any independent expertise in the publishing business. Ziegler testified that he participated in this venture because his daughter read romantic novels and that he was interested in and optimistic about the future of those books. This interest about the field in general and his optimism for romantic novels in particular should have led petitioners to investigate the financial details of their proposed transactions. Yet, other than rather cursory questions addressed to the parties themselves, we cannot find any evidence that petitioners checked any independent sources to ascertain any information pertinent to the operations of Bromwell, Kim, Monroe, Manor Books, Ave Distributing *94 or any of the other participants in this venture. They also did not check into each author's reputation, whether the author had published in the past, the history of sales of that author's books, or any other material which would have been relevant to the chances of success as to their book. Expert testimony at trial showed that the success of a particular romance novel depended in large degree upon the distribution chain established by the particular publisher. Yet, petitioners did not inquire to what extent the publisher had succeeded with past publications. For instance, although the sample documents called for an initial printing of 100,000 copies, the publisher had never printed that many copies of any one particular book either on the initial printing or in cumulative printings. This information should have been very interesting to petitioners in view of testimony that the sale of 541,000 copies would be required just to pay off the purchase price. Further, although the contract called for a nine-year distribution, past history showed that a particular romance novel would be printed only once, and that distribution would take place within a relatively short period of time. *95 Second printings or distributions were rare and were never accomplished by this publisher. Further, we cannot find any evidence that the purchase price of these books was determined with any regard for the profitability of the activity. Rather, the purchase price was set by Bromwell high enough to produce tax benefits which would exceed the cash investment. In fact, the higher the amount placed on the non-recourse note, the higher the potential tax benefits. Therefore, the purchaser would be benefited by a higher purchase price, not by a lower one, which would be the case if a real objective of profit existed.The fact that each book's rvenues would not bear the burden of such a purchase price was of no apparent concern to the parties. This element is crucial in evaluating the objective in this case, as it has been in a number of recent book publishing cases. See e.g., Fuchs v. Commissioner,83 T.C. 79, 99 (1984); Dean v. Commissioner,83 T.C. 56, 75 (1984); Fox v. Commissioner,80 T.C. 972 (1983), affd. by order (2d Cir. Jan 23, 1984), affd. sub nom. *96 Barnard v. Commissioner,731 F.2d 230 (4th Cir. 1984), affd. in unpublished orders sub nom. Kratsa v. Commissioner,Hook v. Commissioner,Rosenblatt v. Commissioner,Leffel v. Commissioner,Zemel v. Commissioner,734 F.2d 5-9 (3d Cir. 1984). See also Flowers v. Commissioner,80 T.C. 914, 941 (1983); Brannen v. Commissioner,78 T.C. at 508. Furthermore, when reports received by petitioners showed that only a small number of their books had been sold (10,007 in the case of Schwartz and 300 in the case of Ziegler), petitioners were not interested enough to check with the distributing company to find out why their books had not achieved better success. They did not question why "Curtis Circulation" and "Ave Distributing" were both mentioned in the initial offering, they were unaware (until close to the time of trial), that Kim had changed distributors (from Ave Distributing to Flynt) and that distribution had been discontinued when a lawsuit was filed against Flynt. In view of expert testimony stressing the importance of the distributor in the success of this type of book, this inaction cannot be reconciled *97 with a profit motive. Furthermore, petitioners never brought any action against either Bromwell or the publisher for failure to initially print 100,000 copies of their books despite the contractual requirement to do so. We believe that all of the above considerations lead to only one conclusion: that the petitioners were interested in the tax deductions and credits that were available from their participation in the Macfadden transaction, and were unconcerned with the actual operation and distribution of their books. We believe that they were unconcerned because they never actually or honestly believed that their books would produce either profit or cash flow. Therefore, we find the petitioners' deductions are limited by section 183. [16]
Much expert testimony was devoted to the fair market value of the books at the time of their purchase. Petitioners' experts did not value *98 the books but rather opined that revenues less distribution costs under the Services Agreement would equal or exceed the purchase price. Even if we assume this testimony to be true on its face, in itself it indicates that no profits were intended. Obviously, if net revenues equal the purchase price, paying the interest on the note alone precludes profits for the investor. Respondent's experts testified that the books were worth less than the amount of cash outlays made by petitioners. Assuming these valuations to be true, we again are led to the conclusion that the sole purpose of the venture had to be the creation of tax benefits in excess of cash outlay. Therefore, taking the testimony of each of the experts at its face, we come to the same conclusion, that there was no actual or honest objective that the books would produce a profit.But we need not do this. In evaluating the experts' testimony we note that petitioners' experts based their opinion on a number supplied by the promoter. They could not even explain how the amounts they testified to were arrived at. This is hardly the kind of independent judgment on which the Court can rely in estimating fair market value. Therefore, *99 this Court awards little credibility to their valuation. The Investment Credit[17]
Section 38(a) provides for a credit against tax for investment in certain property. To qualify, the property must be depreciable. [18]Section 48(a)(1); section 1.48-1(a), Income Tax Regs.; section 1.48-1(b)(1), Income Tax Regs. A depreciation deduction is only allowable with regard to property used in a trade or business (section 162) or held for the production of income (section 212). Section 167(a).When we determined that the Macfadden transaction was not an activity engaged in for profit under section 183(a), we necessarily made a determination that expenses were not duductible under section 162 or 212. Section 183(c); *100 Brannen v. Commissioner,78 T.C. at 500-501. It follows then that the book properties are not subject to depreciation, and, therefore, also are not subject to the investment credit. Accordingly, petitioners are not entitled to claim an investment credit with regard to their book properties. Addition to Tax
The final issue for our decision is whether Ziegler is liable for the addition to tax pursuant to section 6653(a) for the year 1979 or 1980. Section 6653(a) provides for an addition to tax if "any part of any underpayment * * * of any tax * * * is due to negligence or intentional disregard of rules and regulations." Ziegler bears the burden of proving that the addition to tax does not apply to him. Rule 142(a); *101 Lumanv. Commissioner,79 T.C. 846, 860-861 (1982). Again we note that Ziegler is an attorney, but he disclaims expert knowledgment of the tax law. He sought the professional assistance of his CPA who had prepared his income tax returns in the past. However, reliance upon an expert's advice does not, itself, relieve him of his addition to tax. Perrettv. Commissioner,74 T.C. 111, 134-135 (1980), affd. without published opinion 679 F.2 900 (9th Cir. 1982). Quite the opposite in this case. We feel that despite his protestations, Ziegler's own testimony and that of his CPA revealed that they realized that tax deductions and credits offered by the Macfadden transaction were risky and that there was a substantial chance that they would be disallowed. They made a decision to enter upon this venture with the hope that it would escape respondent's scrutiny. When we view this case as a whole, we can only conclude that the recent statement by the Court of Appeals, in Barnard v. Commissioner,731 F.2d 230, 232-233 (4th Cir. 1984), affg. *102 Fox v. Commissioner,supra, is appropriate. The long and the short of it all is that the parties demeaned themselves in entering so dishonest a venture, unquestionably structured to garner for each of the taxpayers tax advantages to which they were not entitled and devoid of any realistic business purpose. In this case we confront only risk-takers who believed they proceeded on a no-loss path * * * if they got away with it, well and good from their misguided point of view, and, if they did not, they would be no worse off than had they never sought the unjustified benefits in the first place * * * It is a frightening prospect when our wealthy citizens, those in the highest income brackets, seek to take indefensible advantage of the country and their fellow citizens, especially those who have far less from which to meet their tax responsibilities. [fn. ref. omitted.] Consequently, we find that the underpayment for the years 1979 and 1980 is attributable to negligence or intentional disregard of the rules and regulations, and accordingly, sustain respondent with regard to this addition to tax. In light of our disposition of this case, we find it unnecessary *103 to discuss the other arguments raised by respondent in support of the disallowance of petitioners' deductions and investment credit. Because respondent has conceded the "constructive discharge of indebtedness" adjustment to Ziegler's income for the year 1980, a recomputation of the deficiency in tax and the addition to tax under section 6653(a) is necessary in that case. Accordingly -- Decision will be entered under Rule 155 in Docket No. 977-83.
Decision will be entered for the respondent in Docket No. 1032-83.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise indicated. All references to "Rules" are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Depreciation claimed by the petitioners exceeded this amount. However, only this amount of loss was deducted because of the limitations of section 465.↩
3. In this connection we note that Ziegler's testimony as to the facts also applies to Schwartz inasmuch as, at trial, Schwartz adopted all of Ziegler's testimony.↩
4. The documents show that the offer also was made by Monroe Anthology, Inc., a/k/a Monroe Library, Inc. The record is unclear as to the relationship between Monroe and Bromwell or whether, in practice, they were separate entities.↩
5. See footnote 5 supra.↩
6. The brochure's cover stated that Macfadden Romances were "Internationally Distributed by Curtis Circulation Company," but the sample documents included a Services Agreement with a company named Ave Distributing Corporation. Ziegler testified that he was impressed by the fact that the "national distributor was supposed to be Curtis Publishing * * * or Curtis Distributing." Although Ziegler later testified that he signed the Services Agreement with Ave Distributing Corporation, he did not offer any explanation as to why two distributors were listed on the initial offering or state whether he questioned it at any time. ↩
7. Schwartz, although he discussed the matters relevant to this case with Ziegler, in large part relied on Ziegler's suggestions and recommendations. Other than his conversations with Ziegler, or conversations held where Ziegler was present, he did not enter into any negotiations or communications with any of the authors, publishers, promoters or distributors.↩
8. Although the documents called for a cash downpayment, the amount of such payment was not specified therein. At trial, testimony showed that Bromwell paid Kim $4,000 per book.↩
9. Petitioners' experts name "Nicole Lindsay" as the author.↩
10. The Services Agreement guaranteed gross receipts of $11,000 and an initial payment of $13,000 to the Services Contractor only payable from such receipts. The accounting above appears to reflect these provisions.↩
11. Because of these factors, neither of petitioners' experts testifying in this case actually read or thought it necessary to read either "Tangled Dreams" or "Let This Be Love" in order to estimate its respective fair market values.↩
12. We note that duplicate adjustments to income appearing on the Notice of Deficiency because of respondent's alternative legal positions have put into question whether respondent must bear the burden of going forward with the evidence at trial because his determinations were arbitrary, capricious or unreasonable. See Meyer v. Commissioner,46 T.C. 65, 82-83 (1966), affd. in part, vacated and remanded in part, 383 F.2d 883 (8th Cir. 1967); Nat Harrison Associates, Inc. v. Commissioner,42 T.C. 601, 617↩ (1964). This argument was not raised by Ziegler and therefore we make no determinations in this regard. We do not consider the failure to make this argument material, however, inasmuch as respondent has presented a very strong case.
13. It appears from the briefs that both petitioners are making this claim. As noted earlier, this adjustment was not a part of the Notice of Deficiency sent to Schwartz. The record is silent as to why petitioners contend this argument applies to Schwartz' case.↩
14. Respondent alternatively claims that the depreciation and investment credit are not allowable to petitioners because the acquisition of the "Book properties" was not an activity entered into for profit. He also claims that the purchase price does not reflect the amount paid for tangible personal property. These alternative legal arguments are discussed later in this opinion.↩
15. In general, section 183↩ limits deductions to the extent of gross income generated from the activity.
16. This finding applies to both petitioners for all years in issue. Because we already have found that Ziegler did not have any interest in his book properties during 1979 and 1980 and Schwartz did not have any interest in his book properties during 1979, the finding is redundant as to those years.↩
17. We have already decided that the investment credit is not allowable to Schwartz for the year 1979 and to Ziegler for the years 1979 and 1980. Therefore, this section is applicable to the disallowance of the investment credit claimed by Schwartz for 1980. It is also an alternative ground for disallowance as to the other years at issue.↩
18. Respondent contends that the purchase price was not totally allocable to these book properties classified as tangible personal property subject to depreciation, but consisted primarily of intangible rights to print the books. Because of our decision above, we do not reach this argument.↩