CHARLES MORKEN AND DIANE MORKEN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Morken v. Commissioner
Docket No. 31377-84.
United States Tax Court
T.C. Memo 1986-535; 1986 Tax Ct. Memo LEXIS 70; 52 T.C.M. (CCH) 969; T.C.M. (RIA) 86535; November 5, 1986. Charles Morken, pro se. Gordon L. Gidlund, for the respondent. GERBER
MEMORANDUM OPINION GERBER, Judge: Respondent *71 determined deficiencies in the Federal income tax of petitioners as follows: Year
Deficiency
1980
$1,017
1981
2,076
After concessions, [1] the issue for consideration is whether petitioners' horse activity was "not engaged in for profit" within the meaning of section 183. [2]
Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time they filed their petition, Charles Morken (Charles) and Diane Morken (Diane) were residents of Mankato, Minnesota, and North *72 Mankato, Minnesota, respectively. Charles and Diane (petitioners) were husband and wife at all times relevant to the proceedings and filed joint returns for the years 1980 and 1981, using the cash method of accounting. [3]
Petitioner is a successful certified public accountant, who owns a farm and horses. His interest in accounting and his love for horses can be traced back to childhood days. He was reared on a dairy farm in southwestern Minnesota. Petitioner's family owned both work horses and riding horses; petitioner enjoyed riding the latter. In high school petitioner was not an exceptional student, however he did well in bookkeeping and agriculture and decided to make accounting his immediate career. After graduating from high school petitioner pursued studies in accounting. Following his attendance at Minnesota School of Business and Mankato State College, petitioner worked as an accountant in the Minneapolis-St. Paul area. In 1976, with the expressed intent of eventually changing his emphasis from accounting to the "horse business, *73 " petitioners and their daughter moved from Skyline, a suburb of Mankato, to a five-acre farm, which petitioner had purchased. Petitioner made improvements to the farm such as constructing a barn and erecting a fence enclosure. Petitioner paid about $80,000 for the farm and improvements. [4]
Around November 1977, petitioner left the accounting firm where he was employed, and began a smaller firm. From about November 1977 through 1979, petitioner worked up to 100 hours a week. [5] Also, about that time petitioner began research on horses; he acquired pamphlets on various breeds and attended horse expositions, horse seminars, [6] and a state fair. Eventually, petitioner bought two ponies (Maude and Chico) and a half-Arabian mare (Mes-Freyer). [7] Petitioner purchased ponies because he believed they were hardy animals, and although Maude and Chico were halter broken he thought ponies were good animals with which he could begin to learn more about caring for horses. Petitioner purchased Mes-Freyer from Mary Frost, an interior designer who had designed an office for an accounting *74 firm for which petitioner had worked, because Ms. Frost was moving from Mankato to the east, and "talked me [Charles] into that that [Mes-Freyer] would be a very suitable horse." Petitioner knew nothing, nor did he make any inquires, about Mes-Freyer's bloodline at the time he purchased her. [8]
Mes-Freyer was not bred in 1977, 1978 or 1979. In 1980, petitioner had Mes-Freyer bred and she produced a foal which developed Wobbler Syndrome disease at six months. The foal was sold at an auction for $80. [9]
Around 1981, after considering various horse types, petitioner decided to breed Arabian horses in the medium price range, because *75 he believed they would be most profitable and petitioner knew people familiar with this type of horse. [10] Also, in 1981 petitioner purchased an Arabian mare (Khalonie) from a horse farm near Mankato. Before making the purchase, he talked with Suzette Johnson, a trainer at the farm. Khalonie was in foal when she was purchased and gave birth to Lady Lonnie in 1982. [11] At the time of trial, Lady Lonnie was still on the farm. Meanwhile, petitioner took the two ponies to the "home farm" run by his brother, [12] but he kept Mes-Freyer on the farm as a companion horse to Khalonie. [13]
*76 Petitioner cared for and fed the horses on a daily basis. He mucked the stalls and made all the necessary repairs to the farm.During the years at issue, petitioner subscribed to an Arabian horse magazine; was a member of the International Arabian Association and Minnesota Horse Council; and was an avid reader of horse books. [14] Additionally, he attended horse auctions and had discussions with horse experts and trainers, however petitioner did not show or advertise any of his horses. [15]
Petitioner's involvement with horses attracted new clients to his accounting firm. He estimated that the annual fees increased about $13,000 per year, because of these clients. In addition to his horse activity and accounting practice, petitioner was involved in other activities including being a part-owner *77 of a computer service center, and having an interest in antique cars. The fates of these ventures have been varied. Although petitioner kept track of which expenses related to which activity, he paid the expenses of all of his activities from the same checking account. During the years at issue, petitioners reported income from wages, interest, and subchapter S dividends of $63,999 and $82,255 for 1980 and 1981, respectively, and claimed deductions for expenses attributable to the horse operation in the amounts of $1,916 and $2,454, respectively. OPINION The sole issue to be decided is whether petitioner's horse activity was engaged in for profit. Section 183(a) generally provides that individual taxpayers will not be allowed deductions which are attributable to activities that are "not engaged in for profit." An "activity not engaged in for profit" is defined in section 183(c) as "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 [trade or business] or under paragraph (1) or (2) of section 212 [expenses for production of income]." Section 1.183-2(a), Income Tax Regs., further provides: The determination *78 whether an activity is engaged in for profit is to be made by reference to objective standards, taking into account all of the facts and circumstances of each case. Although a reasonable expectation of profit is not required, the facts and circumstances must indicate that the taxpayer entered into the activity, or continued the activity, with the objective of making a profit. In determining whether such an objective exists, it may be sufficient that there is a small chance of making a large profit. * * * In determining whether an activity is engaged in for profit, greater weight is given to objective facts than to the taxpayer's mere statement of his intent. Additionally, the regulations set forth nine criteria normally taken into account in determining whether an activity is engaged in for profit. [16] Resolution of this issue depends on all the facts and circumstances of the case; no single factor is controlling. Engdahl v. Commissioner,72 T.C. 659, 666 (1979); Allen v. Commissioner,72 T.C. 28, 34 (1979). *79 Breeding and raising horses may constitute a trade or business for purposes of section 162, if the taxpayer engaged in the venture with the predominant purpose and intention of making a profit. Engdahl v. Commissioner,supra at 665-666. In order to establish that the activity was engaged in for profit, a taxpayer must show that he entered into or continued the activity with the actual and honest objective of making a profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner78 T.C. 642, 645 (1982), affd. without opinion 762 F.2d 1085 (D.C. Cir. 1983). In making this determination, more weight is accorded to objective facts than to the taxpayer's statement of intent. Sec. 1.183-2(a), Income Tax Regs.; Siegel v. Commissioner,78 T.C. 659, 699 (1982). Petitioner bears the burden of proving that he possessed the required profit objective. Rule 142(a); Dreicer v. Commissioner,supra;Golanty v. Commissioner,72 T.C. 411 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981). Petitioner contends that he was in the business of raising and breeding *80 horses. Respondent argues that petitioner's horse activity was a hobby. We agree with respondent. Petitioner argues that he conducted the horse activity in a business-like manner. He contends that he followed a plan, accounted separately for his expenses, researched various horse breeds, and kept costs low. We, however, agree with respondent that petitioner's horse activity had few "trappings of a business." See Bessenyey v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967). The initial horse purchases petitioner made (Maude, Chico and Mes-Freyer) were not well researched or well planned. Petitioner bought the ponies with the stated intent to learn more about horses, even though the ponies were halter-broken when he bought them.He ended up moving these ponies to another farm and then selling them. We note that petitioner purchased Mes-Freyer from an interior designer acquaintance who was moving across the country. Petitioner allowed her to "talk" him into believing that Mes-Freyer "was a very suitable horse," without knowing anything or making any inquiries about Mes-Freyer's bloodline. In fact, the horse apparently carries *81 Wobbler Syndrome disease, which was passed on to one of its foals. [17]
During the years at issue, petitioner purchased only one other horse, Khalonie, an Arabian mare with foal. That foal, Lady Lonnie, remains on the farm. Khalonie, Mes-Freyer, and their foals are also on the farm. By the time of trial, petitioner had purchased a one-half interest in another horse. Petitioner has neither advertised nor shown any of his horses.Additionally, petitioner generally did not consult trainers or breeders. During the years in issue, he owned only two breeding mares, one, arguably, unsuitable for breeding purposes. The only foal petitioner sold was sold for $80 at an auction. Although petitioner kept his costs low, it was unrealistic to expect to make a profit without revenues. Petitioner attributes his lack of revenues to bad luck, unforeseen circumstances and a decline in the Arabian horse market. We, however, attribute his lack of revenues to the lack of a genuine profit motive. Petitioner entered his horse *82 activity virtually ignorant about the horse raising and breeding industry or its profitability. Additionally, he took almost no affirmative action to generate revenues.[18] Petitioner attributes this inaction to the unexpected change in his accounting practice which required him to work longer hours. Such inaction, however, is inconsistent with petitioner's desire to make a profit in his horse activity. Thus, we are not persuaded that petitioner's purchase of two horses and sale of one foal for butcher establishes a genuine and actual profit motive ( Faulkner v. Commissioner,T.C. Memo. 1985-536), especially when considered in light of petitioner's failure to investigate the profitability of breeding only one or two horses. Deerman v. Commissioner,T.C. Memo. 1974-84. Petitioner further contends that the appreciation of the farm and the revenue from the additional clients he attracted to his accounting practice through the horse activity more than offset any losses that he has *83 claimed with respect to his horse activity. Petitioner's claim with respect to the appreciation of the land rests implicitly on the proposition that holding the land and operating the farm constitute a single activity. Petitioner's claimed appreciation rests on unsubstantiated estimates, however, and we reject it on that basis. See Feldman v. Commissioner,T.C. Memo. 1986-287. Additionally, we are not convinced that petitioner bought or held the land primarily with the intent to profit from the increase in its value. See sec. 1.183-1(d)(1), Income Tax Regs.; Estate of Power v. Commissioner,736 F.2d 826, 829 (1st Cir. 1984), affg. a Memorandum Opinion of this Court. Petitioner's contention that his increased revenues from his accounting business should be offset against his losses from the horse operation, to realize a net overall profit, is also without merit. The evidence presented on this issue consists solely of petitioner's testimony and a summary of client names. We find petitioner's testimony on this point unconvincing. Additionally, petitioner's goal of generating accounting revenues through his horse activity does not support petitioner's *84 claim that he had a genuine belief that the horse operation itself would be profitable. To the contrary, the belief that accounting revenues may increase would have lessened petitioner's concern about losses from the horse operation. We agree with respondent that petitioner did not have an actual and honest objective of making a profit from his horse operations. Petitioner did not operate his "horse activity" in a business-like manner; he spent little time with this activity compared to time he spent with his accounting practice. Additionally, although petitioner's family lacked interest in horses, he took great pleasure in reading about horses, attending horse events and caring for the horses. Petitioner testified about eventually engaging in the horse operation full-time, and that he had planned to do so for many years. The steps petitioner took, however, do not amount to any kind of business undertaking full-time or part-time. [19]
Decision will be entered under rule 155.
Footnotes
1. Respondent disallowed $932 and $877 of petitioners' auto expense deductions for the taxable years 1980 and 1981, respectively. Petitioners' conceded $885.60 and $804.60 of the disallowed amounts; respondent conceded the balance. Additionally, petitioners conceded the disallowed investment tax credit of $436 for 1981 and the increase of $48 and $39 resulting from dividend income adjustments. ↩
2. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. Diane is a party solely by filing a joint return with her husband; therefore we refer to petitioner (Charles) in the singular.↩
4. Petitioner estimated that the fair market value of the farm at the time of trial was about $120,000.↩
5. Apart from tax season, his work hours relaxed somewhat in 1980 and 1981 to about 50 hours a week. ↩
6. Petitioner's accounting firm paid for him to attend some of the horse seminars. ↩
7. Although Mes-Freyer was 7/8's Arabian, she could only be registered as a half-Arabian. ↩
8. This is important in predicting how valuable the foals will be.↩
9. Experts disagree as to the cause of Wobbler Syndrome disease. One respected theory is that the disease is inherited, and petitioner guessed that the disease passed through the mare's bloodline.↩
10. Actually, the medium priced Arabian horse market declined in the 1980's because of an oversupply of horses. ↩
11. In 1983, Khalonie had another foal that died when petitioner was trying to halter break it. Khalonie was rebred in 1983, but this mating did not result in a pregnancy. In 1984, Khalonie was bred again, and a foal was born in 1985. That foal remains on the farm. Khalonie was with foal at the time of trial. ↩
12. The ponies were sold in 1982. ↩
13. Petitioner had Mes-Freyer bred again, despite her propensity to pass Wobbler Syndrome disease to her foals. Mes-Freyer had another foal in 1985, and was in foal at the time of trial.↩
14. Petitioner read horse magazines for about an hour each night before going to bed. Neither his wife nor his daughter were horse lovers, however, and petitioner attributes his subsequent divorce as resulting, in part, from his interest in horses. ↩
15. A primary use of Arabian horses is for show purposes. These horses can earn points at shows which generally increase their value.↩
16. These criteria are: (1) The manner in which the taxpayer carried on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that the assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profit, if any, which is earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. Sec. 1.183-2(b), Income Tax Regs.↩
17. Petitioner kept Mes-Freyer on the farm as a companion horse for Khalonie, and subsequently had her bred again, despite her propensity to pass Wobbler Syndrome disease.↩
18. The only time petitioner entered the market was to sell a foal for butcher. He, therefore, cannot attribute his lack of revenues from the decline in the market.↩
19. Cf. Bramlage v. Commissioner,T.C. Memo. 1985-621↩.