RICHARD L. EISENMAN AND CAROLE A. EISENMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Eisenman v. Commissioner
Docket No. 2010-86
United States Tax Court
T.C. Memo 1988-467; 1988 Tax Ct. Memo LEXIS 492; 56 T.C.M. (CCH) 330; T.C.M. (RIA) 88467; September 27, 1988
Jan S. Neiman, for the petitioner. Bernard P. Coniff, for the respondent. WELLS
MEMORANDUM FINDINGS OF FACT AND OPINION WELLS, Judge: Respondent determined deficiencies in petitioners' taxes for years 1976 through 1982 in the following amounts: Year
Deficiency
1976
$ 3,441.85
1977
432.00
1978
2,072.73
1979
6,572.88
1980 7.00
1981
3,755.00
1982
3,614.00
*494 The sole issue of consideration is whether petitioners' horse breeding activity was an "activity not engaged in for profit" within the meaning of section 183. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioners resided in Plantation, Florida, when they filed their petition. Petitioner Richard L. Eisenman is a contractor, who works for a company known as Ecco. Petitioner Carole A. Eisenman is self-employed as a realtor. For the taxable years in issue, petitioners filed joint income tax returns. Petitioners hold interests in a 1,750 acre farm in Ohio and an airport named South Columbus Airport. In the past petitioners have held interests in a nursery in Lake Worth, Florida, and a "fixed base operation" in Columbus, Ohio. The latter business sold and chartered aircraft and performed aircraft maintenance. *495 Petitioners have never actively participated in the daily operations of any of the foregoing businesses, but have instead relied upon managers to perform such work. All of the businesses have operated profitably. Petitioners have owned horses since at least 1974. They have boarded those horses with Ben and Joan Young (the "Youngs"). Sometime in 1975 petitioners decided to purchase Arabian horses. In 1975, petitioners began to study trade literature and consulted with the Youngs and various veterinarians and horse owners about horse breeding. The Youngs advised petitioners to look through classified ads in the newspapers and trade magazines and determine what "bloodlines" were of interest to them. Petitioners also spoke with their accountant, Bruce Soule, who advised petitioners of the factors considered by the Internal Revenue Service in determining whether an activity will be classified as a hobby or an activity engaged in for profit. Petitioners finally decided to purchase Arabian horses because Arabians require a lower initial investment than other horses held for profit. Petitioners began to shop for Arabians and visited a number of ranches and shows. They spoke to *496 8 to 12 owners and examined between 50 and 80 horses. The Youngs usually accompanied petitioners on those shopping expeditions. On March 20, 1976, petitioners purchased for $ 7,500 three Arabian mares named Raff Sharla, El Natafa, and Widgette. The Youngs were present when petitioners selected those horses. All three mares had been registered with The Arabian Horse Registry of America and were purebred Arabians. After the purchase, petitioners continued to own a number of "pleasure horses," that were ridden by petitioners' four daughters. Petitioners' oldest daughter, Tracy, also rode Raff Sharla in a few showings. Petitioners themselves do not ride horses. On March 20, 1977, petitioners contracted to have Raff Sharla and El Natafa breed with a stallion named High Hopes. Petitioners selected High Hopes after consulting the Arabian Horse Stud Book and researching the purchase prices for foals sired by High Hopes. Petitioners discovered that High Hopes had won five national championships. On March 8, 1978, Raff Sharla gave birth to a mare named Hi Bolt, which petitioners registered with the Arabian Horse Registry of America. El Natafa did not successfully breed. On *497 April 1, 1980, petitioners sold the three Arabian mares they had purchased in 1976. Although petitioners would have accepted their original cost for the horses, $ 7,500, they received $ 9,000. Beginning in 1982, petitioners employed Jean Rothe to train Hi Bolt. Petitioners selected Ms. Rothe on the advice of the Youngs and instructed Ms. Rothe to train Hi Bolt for riding so that Hi Bolt could be taken to shows. Ms. Rothe took Hi Bolt to two shows, and the horse placed second in one of the shows. Prior to training Hi Bolt, Ms. Rothe had trained her own Morgan horse as well as two Arabian horses for Mrs. Young. In December 1984, the Youngs appraised Hi Bolt at $ 25,000. In early 1985, petitioners consulted Mr. Robert F. Reardon. Mr. Reardon has 25 years of experience in breeding and training Arabian horses and is certified by a number of trade organizations. Petitioners obtained an appraisal of Hi Bolt from Mr. Reardon as well as a letter outlining Mr. Reardon's suggestions for improving the horse's value. In a letter dated April 19, 1985, Mr. Reardon valued Hi Bolt at between $ 20,000 and $ 25,000. A second letter dated May 13, 1985, recommended that Hi Bolt be trained, *498 bred and shown. The letter also stated that as a foal of High Hopes, Hi Bolt could demand "$ 75,000 and up" if Hi Bolt were to be bred to a "strong bloodline" and sold while pregnant. Hi Bolt appeared "crudely trained" when Mr. Reardon examined her in early 1985, but she progressed "more than adequately" after that time. Hi Bolt also suffered from "mastitis," a disease which caused inflammation of the mammary glands. Mastitis, however, can be treated, and a horse suffering from the disease may breed after the infection clears. Beginning in April, 1986, Ms. Wallace Fry replaced Ms. Rothe as Hi Bolt's trainer. The Youngs instructed her to prepare Hi Bolt "for show." Hi Bolt was a "very, very upset animal" when Ms. Fry first began performing her duties as trainer. As noted, however, Hi Bolt progressed after 1985 and would possibly be ready for showing in the fall of 1987. Prior to her employment for petitioners, Ms. Fry possessed experience as a trainer and had shown horses. By letter dated March 18, 1987, Gary L. Waldron offered petitioners $ 55,000 for Hi Bolt. Mr. Waldron made this offer on the advice of a friend who told him that $ 55,000 was a "bottom dollar price" for *499 a healthy horse of Hi Bolt's parentage. The offer letter conditioned the offer on the certification by Mr. Waldron's veterinarian of Hi Bolt's "good health and sound condition." By letter dated March 23, 1987, petitioners rejected Mr. Waldron's offer. Petitioner Richard J. Eisenman admits that his rejection letter falsely represents that petitioners had Hi Bolt appraised at $ 85,000, but petitioner believed that the representation was mere "puffing." Petitioners' letter contained a counteroffer to sell Hi Bolt for $ 80,000 cash. Petitioners maintained an expense ledger, which reflected payments for boarding, veterinarian fees, supplies, shoes, and labor (training). [2] Entries on the ledger disclosed the dates of payments, check numbers, amounts paid, and the names of payees. Also, petitioners gave the Youngs separate checks for the costs of boarding the Arabian and the horses which were ridden by petitioners' daughters. During the taxable years in issue, petitioners reported the following deductions in connection with their horse breeding *500 activity: Year
Expenses
Depreciation
1976
$  5,910.53
$ 2,678.71
1977
6,499.63
2,225.45
1978
10,046.23
1,397.51
1979
10,225.00
892.00
1980
5,560.00
158.00
1981
5,404.00
143.00
1982
4,188.00
89.00
Totals
$ 47,863.39
$ 7,583.87
In the following three taxable years, petitioners reported the following deductions: [3]
Year
Expenses
Depreciation
1983
$  4,737.00
$  37.00
1984
4,477.00
49.00
1985
4,822.00
- 0 -
Totals
$ 14,036.00
$  86.00
OPINION Respondent asserts that section 183 disallows all deductions attributable to petitioners' horse breeding activity. Section 183(a) supplies the general rule which disallows all deductions attributable to activities "not engaged in for profit." Section 183(b)(1) then allows these deductions otherwise allowable regardless of profit motive, e.g., interest, State and local taxes. In addition, section 183(b)(2) *501 allows those deductions which would have been allowable had the activity been engaged in for profit, but only to the extent that gross income from the activity exceeds the deductions allowable under section 183(b)(1). Respondent argues that petitioners' horse breeding activity was "not engaged in for profit" and that, therefore, deductions taken by petitioners for taxable years 1976 through 1982 which are attributable to such activity must be disallowed to the extent they exceed gross income from the activity. [4]
*502 Petitioners reply that they commenced and continued their horse breeding activity with the requisite profit motive. Thus, petitioners argue, section 183 is inapplicable, and the deductions attributable to the horse breeding activity are fully deductible under sections 162 or 212 and section 167. We must decide whether section 183 applies to petitioners' horse breeding activity. Section 183(c) defines an activity which is "not engaged in for profit" as, "any activity other than one with respect to which deductions are allowable for the taxable year under section 162 or under paragraph (1) or (2) of section 212." Thus, section 183 does not apply if petitioners' activity gives rise to deductions under section 162 or under section 212(1) or (2). Deductions are permitted under those sections if an activity is commenced and continued with the "actual and honest objective of making a profit." Dreicer v. Commissioner,78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983); Golanty v. Commissioner,72 T.C. 411, 426-427 (1979), affd. without published opinion *503 647 F.2d 170 (9th Cir. 1981); Brannen v. Commissioner,78 T.C. 471, 501 (1982), affd. 722 F.2d 695 (11th Cir. 1984). Petitioners need not, however, establish that they had a "reasonable" expectation of profit. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 644-645. Whether petitioners had the requisite intent is an issue of fact to be resolved on the basis of all surrounding circumstances. Sec. 1.183-2(b), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. In making our determination, we give greater weight to objective factors than to petitioners' statements of intent. Sec. 1.183-2(a), Income Tax Regs.; Dreicer v. Commissioner, supra at 645. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering,290 U.S. 111 (1933). Giving due regard to the aforementioned precepts, we find that petitioners did possess the requisite profit objective and that section 183 does not apply to the facts of this case. Section 1.183-2(b), Income Tax Regs., contains a nonexclusive list of nine factors, derived from case law, to be considered in *504 determining whether an activity is engaged in for profit. Allen v. Commissioner,72 T.C. 28, 33 (1979); Benz v. Commissioner,63 T.C. 375, 382-383 (1974). The factors are: (1) the manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or loss with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) whether elements of personal pleasure or recreation are involved. No single factor is determinative, and all facts and circumstances, including factors not listed, are to be considered. Sec. 1.183-2(b), Income Tax Regs., Abramson v. Commissioner,86 T.C. 360, 371 (1986). The manner in which petitioners carried on their horse breeding activity indicates that they engaged in the activity with the requisite profit objective. The *505 regulations cite complete and accurate record keeping as indicative of an activity engaged in for profit. Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners kept an expense ledger which reflected the costs of their activity. Those costs were classified under various categories, e.g., "boarding," "training," and "veterinarian fees." Also, petitioners paid boarding fees for their Arabian horses and their "pleasure" horses with separate checks. The regulations also state that "a change of operating methods, * * * or abandonment of unprofitable methods in a manner consistent with an intent to improve profitability may also indicate a profit motive." Sec. 1.183-2(b)(1), Income Tax Regs. Petitioners sold three mares in 1980 because they believed that they could maximize profits by selling the mares and retaining Hi Bolt for eventual sale. Expenses reported by petitioners for their horse breeding activity declined beginning in 1980, the year of sale. In large part, the decline stems from reduced boarding costs. For example, boarding costs amounted to $ 9,189 in 1979, when the horse operation had four horses (Raff Sharla, El Natafa, Widgette, and Hi Bolt), while boarding costs totalled *506 $ 2,499 in 1982, when only Hi Bolt was held in the activity. Such adaptations are indicative of profit objective. Respondent points out that petitioners attempted to breed Widgette and did not make second attempts at breeding Raff Sharla and El Natafa after 1977, providing that petitioners did not carry on their activity in a businesslike manner. Widgette, however, was too young to breed in 1977 and 1978, and petitioners did not make further attempts to breed Raff Sharla or El Natafa in 1978 on the advice of a veterinarian. Widgette's registration discloses that she was less than three years old when purchased by petitioners. While el Natafa's registration states "This mare was bred at the age of two years and nine months," the very fact that the special notation appears on El Natafa's registration suggests to us that breeding at the age of two years and nine months is the exception rather than the rule. El Natafa was almost nine when purchased by petitioners, while Raff Sharla was approximately six. Petitioners gained some expertise in the field of horse breeding and also relied upon the advice of more experienced advisors. The record discloses that prior to making important *507 decisions, petitioners consulted advisors, studied trade literature, or did both. For example, they read trade magazines and spoke to the Youngs, veterinarians, and horse owners before purchasing the original, three Arabian mares. Prior to selecting High Hopes as a stud, they consulted the Arabian Horse Stud Book and inquired about the prices of foals sired by High Hopes. Petitioners also relied upon the Youngs, who had over 20 years of experience with horses at the time of trial, to select Ms. Rothe and Ms. Fry as Hi Bolt's trainers. In sum, petitioners engaged in the type of study, consultation, and planning which indicates profit motive. Engdahl v. Commissioner, supra at 668; sec. 1.183-2(b)(2), Income Tax Regs.
Petitioners' failure to devote much of their personal time to the horse breeding activity does not weigh against them, because they employed "competent and qualified persons" to oversee the day-to-day operations of the activity. Sec. 1.183-2(b)(3), Income Tax Regs. The Youngs made such decisions as whether to call a veterinarian or have a blacksmith make shoes. There is every indication that they were more capable of making those decisions than petitioners. Ms. *508 Rothe and Ms. Fry both worked at training Hi Bolt. Both had more experience at training horses than petitioners. Although there is some evidence in the record that Hi Bolt failed to progress with Ms. Rothe, hindsight can be a harsh judge. Ms. Rothe did possess some experience when she was hired. Further, while respondent points out that neither Ms. Rothe nor Ms. Fry possessed any formal education qualifying them to train horses, we agree with Mrs. Young, who testified that training horses is a skill acquired through experience rather than classroom lecture. [5] In Golanty v. Commissioner, supra at 432, we held section 183 applicable to a horse breeding activity. We noted, however, that the taxpayers in that case employed "amateurs," mainly friends and family members, to care for their horses. The facts in the instant case are clearly distinguishable from those in Golanty.
Petitioners held Hi Bolt with the expectation that she would appreciate and be sold for profit. The regulations cite such potential for *509 appreciation as indicative of profit motive. Sec. 1.183-2(b)(4), Income Tax Regs. For taxable years 1976 through 1985, petitioners reported deductions attributable to the horse breeding activity of $ 69,569.26. Since petitioners realized $ 9,000 in 1980, at the end of 1985, they needed to realize an additional $ 60,569.26 from Hi Bolt's sale in order to recover their costs. [6] Assuming arguendo that petitioners did not sell Hi Bolt prior to the end of 1987, and therefore adding $ 10,000 to the amount of costs to be recovered (although annual costs averaged $ 4,707.33 during taxable years 1983 through 1985), we nevertheless find that petitioners could have realized an overall profit from their operation by selling Hi Bolt for over $ 70,000. Our finding is supported by the record. Specifically, Mr. Reardon opined on May 13, 1985, that Hi Bolt could sell for "$ 75,000 and up" if properly trained, shown, and bred to a "strong bloodline." By the time of trial *510 in June, 1987, Hi Bolt's training had progressed "more than adequately," according to Mr. Reardon, and Ms. Fry testified that Hi Bolt could be shown in the fall of 1987. We also accept petitioner's testimony that some horse buyers may prefer to select their own studs and will, therefore, choose mares who are not pregnant. We believe that petitioner's decision to market Hi Bolt without first having her bred does not indicate the lack of profit motive, because a high quality stud such as High Hopes can be rented for as little as $ 750 - $ 1,000. Since a buyer would not have to incur significant stud fees after purchasing Hi Bolt, a buyer would not materially discount Hi Bolt because she was not pregnant. Further, Mr. Waldron offered $ 55,000 for Hi Bolt in a letter dated March 18, 1987, but Mr. Waldron also considered the offer a "bottom dollar price." Respondent has argued that petitioner was less than forthright with Mr. Waldron. While petitioner testified that he gave Mr. Waldron a copy of the horse's registration certificate, Mr. Waldron testified otherwise. Mr. Waldron's offer letter, however, refers to "registration number 195677," which is Hi Bolt's registration number. *511 We must conclude that Mr. Waldron somehow had access to Hi Bolt's registration certificate and that petitioner testified truthfully to supplying Mr. Waldron with a copy of this certificate. Also, respondent's suggestion that petitioner lied to Mr. Waldron about Hi Bolt's age must be rejected, as Hi Bolt's registration certificate would have disclosed her true age. In sum, we cannot say, as we did in Golanty v. Commissioner, supra at 428, there is "no prospect that the operation will earn sufficient income to offset past losses." Petitioners have not engaged in activities similar to horse breeding, but they have earned profits from other business ventures, namely, the farm, the airport, the nursery, and the fixed base operation. Petitioners did not subsist solely upon salary and commissions from their regular employments but sought business profits as well. We are convinced that petitioners possess a keen business acumen and that they commenced and continued their horse breeding activity as they did their other businesses, namely, with a profit motive. Petitioners' horse breeding activity has produced losses in each year of operation except 1980, when petitioners *512 sold three mares for a gain of $ 5,790 and reported deductions of $ 5,718. [7]A history of consistent losses does not, however, by itself prove conclusively that an activity is not engaged in for profit. Bresseney v. Commissioner,45 T.C. 261, 274 (1965), affd. 379 F.2d 252 (2d Cir. 1967), cert. denied 389 U.S. 931 (1967). In Engdahl v. Commissioner, supra at 668-669, we found that petitioners' willingness to sustain continued operating losses was explained by "the bona fide expectation that the assets used in their horse operation would increase [in value]." Similarly, given Hi Bolt's potential value, we do not view petitioners' history of losses as fatal to their position in this case. Sec. 1.183-2(b)(6), Income Tax Regs. Further, unforeseen circumstances such as the illness of horses and poor performance from trainers may explain a long history of losses. Engdahl v. Commissioner, supra at 669. In the instant case, health reasons prevented El Natafa from breeding, while Hi Bolt's somewhat retarded training might be explained by her mastitis as well as mistakes made by Ms. Rothe. *513 The regulations state that "substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit especially if there are personal or recreational elements involved." Sec. 1.183-2(b)(8), Income Tax Regs. In Engdahl v. Commissioner, supra at 670, we construed the foregoing language to mean that "the expectation of being able to arrange to have the tax collector share in the cost of a hobby may often induce an investment in such a hobby which would not otherwise occur." Although petitioners earned substantial income from sources other than the horse breeding activity, we do not believe they engaged in the activity for pleasure or viewed the tax benefits flowing from the activity's losses as partially subsidizing a "hobby." Rather, the record discloses the lack of "personal or recreational elements." Petitioners do not ride horses. Although their daughters do ride, petitioners kept separate horses for the use of their daughters. Additionally, no member of petitioners' family has ever ridden Hi Bolt. Although petitioners' oldest daughter, Tracy, rode Raff *514 Sharla in a few shows, this fact is entirely consistent with the existence of a profit motive because Tracy had experience in training horses (she had worked at a racetrack) and such showings can increase the value of a horse. It does not appear that petitioners even view Hi Bolt with any frequency. In certain years petitioners allocated a large percentage of their adjusted gross income to the horse breeding activity, which indicates that the activity was not a mere "hobby." For example, for taxable year 1977 petitioners reported $ 17,803.48 in adjusted gross income and deducted $ 8,725.08 in expenses attributable to the activity (49 percent of their adjusted gross income). Even if we subtract $ 432 of tax savings [8] from costs of $ 8,725.08, the fact remains that the activity cost petitioners $ 8,293.08, or roughly 46 percent of their adjusted gross income. For taxable year 1978, petitioners reported $ 13,442.01 in adjusted gross income and activity costs of $ 9,371.01 net of tax savings ($ 11,443.74 - $ 2,072.73). [9] Thus, they allocated roughly 69 percent of their adjusted gross income for taxable year 1978 to the horse breeding activity. While in other years petitioners did *515 not invest comparable percentages of their incomes in the activity, petitioners have consistently spent sizeable amounts for training and other items, indicating that their interest in the activity is serious and profit oriented as opposed to casual and frivolous. Compare Golanty v. Commissioner, supra at 429, where we found that after-tax expenditures of 10.2 and 5.5 percent of the gross income did not evidence profit motive.
In sum, after considering the record as a whole, and particularly petitioners' practice of consulting experienced advisors before making critical decisions, their investment of significant sums in Hi Bolt's training although neither petitioner rides, and the real possibility that the horse breeding activity could generate an overall profit upon Hi Bolt's sale, we find that petitioners engaged in their horse breeding activity for profit. We therefore hold that section 183 does not apply to petitioners' horse breeding activity and that petitioners are entitled to deductions attributable to the activity for the *516 taxable years in issue. To reflect the foregoing and concessions by petitioner, Decision will be enteredunder Rule 155.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue code of 1954, as amended and in effect for the taxable years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. The record does not clearly reflect whether petitioners maintained a separate checking account for their horse breeding activity. ↩
3. Although these taxable years are not in issue, these figures are important because our analysis of the instant case involves determining whether petitioners are capable of recovering their investment in this activity. ↩
4. While respondent argues in opening brief that the activity generated no gross income, the record discloses otherwise, as three mares were sold in 1980 at a price $ 1,500 above cost. Respondent apparently overlooks that fact and section 183(b)(2), which allows deductions to the extent of gross income. None of the deductions in issue may be classified as a deduction which may be taken regardless of profit motive, under section 183(b)(1). Rather, petitioners have deducted items such as boarding costs, veterinarian fees, blacksmith fees, training costs, supplies, and depreciation. We also note that at trial respondent sought for the first time to discredit petitioners' substantiation of those deductions. The notice of deficiency makes no mention of a failure to substantiate the deductions, and there is no evidence that the issue was brought to petitioners' attention prior to trial. Indeed, respondent seems to acknowledge the impropriety of advancing the issue, as it is mentioned only in passing in opening and reply briefs. Under the circumstances, we refuse to consider substantiation, because respondent's failure to give "fair warning" of the issue has prejudiced petitioners in the preparation of their case. Pagel, Inc. v. Commissioner, 91 T.C.    (August 8, 1988); William Bryen Co. v. Commissioner,89 T.C. 689, 707↩ (1987). 5. Specifically, Mrs. Young testified: "I think you have to work with them [horses], and it's being around them and learning how to handle them." ↩
6. Actually, because petitioners have conceded to reduced depreciation deductions, a lower sales price would result in the recovery of costs. For the sake of simplicity, however, we will continue to use the reported costs. ↩
7. Petitioners realized $ 9,000 for the mares, while their adjusted basis equaled $ 3,210, the original cost basis of $ 7,500 less $ 4,290 of depreciation deductions. Thus, the $ 5,790 gain includes recapture of the $ 4,290 in depreciation. Respondent argues that petitioners realized only a $ 1,500 gain on the sale, ignoring the recapture component. ↩
8. This is the amount of the deficiency determined for 1977. ↩
9. This is the amount of the deficiency determined for 1978. ↩