EDWARD AND KATHLEEN HOLBROOK, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Holbrook v. Commissioner
Docket No. 1898-92
United States Tax Court
T.C. Memo 1993-383; 1993 Tax Ct. Memo LEXIS 388; 66 T.C.M. (CCH) 484; August 24, 1993, Filed *388 Decision will be entered under Rule 155. Ps operated a farm on which they bred, trained, and sold horses. Ps personally did all the work on the farm, sought and followed expert advice, and kept detailed records. Ps intended to make a profit, but incurred an uninterrupted series of losses. Held: Based on the facts and circumstances of the case, the horse farm was an activity engaged in for profit under sec. 183. For petitioners: Nicholas J. Harding [1] and Robert J. Percy. [1]
For respondent: Tracy Ann Murphy. LARO
LARO
MEMORANDUM FINDINGS OF FACT AND OPINION LARO, Judge: Respondent determined deficiencies in and additions to the Federal income taxes of petitioners as follows: Additions to Tax Sec. Sec.
Year
Deficiency
6653(a)
6653(a)(1)
1979
$    454
-- -- 1980
3,598
$ 180
-- 1981
4,702
-- $ 235
1982
9,849
-- 492
1983
12,861
-- 643
1984
10,488
-- 524
1985
10,929
-- 546
1986
7,832
-- --
Additions to Tax Sec.
Sec.
Sec. Year
6653(a)(2)
6653(a)(1)(A)
6653(a)(1)(B) 1979
-- -- -- 1980
-- --  -- 1981
[1]
-- -- 1982
[1]
-- -- 1983
[1]
-- -- 1984
[1]
-- -- 1985
[1]
-- -- 1986
-- $ 392
[1]
*389 Following concessions by the parties, the issues for decision are: (1) Whether petitioners' horse breeding, training, and sales activity during the taxable years at issue was an activity "not engaged in for profit" within the meaning of section 183 and (2) whether petitioners are liable for additions to tax for negligence for the 1980 through 1986 taxable years under section 6653(a). [2] *390 We hold for petitioners on both issues. [3] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulations and exhibits attached thereto are incorporated herein by this reference. Edward and Kathleen Holbrook are husband and wife. They filed Federal income tax returns for the years at issue using the status of "Married filing joint return". At the time the petition was filed, they resided in Averill Park, New York. Hereinafter, Edward and Kathleen Holbrook are collectively referred to as petitioners and are separately referred to *391 as Dr. Holbrook and Mrs. Holbrook, respectively. Background of the Horse Farm
Petitioners were born in England and moved to the United States in 1974. They have three children: Samantha, born on May 12, 1965; Morgan, born on August 18, 1971; and Courtney, born on May 6, 1977. During the taxable years at issue, petitioners' main source of income was wages earned by Dr. Holbrook. Mrs. Holbrook is an expert in the care, training, breeding, and showing of horses. She began riding horses in England when she was a child. In 1973, she and her daughter Samantha received formal training at the Askern Riding School in England. After moving to the United States in 1974, Mrs. Holbrook and Samantha continued training at the 20-horse stable owned by Carol Northrup (Northrup) in Manlius, New York. In 1977, Mrs. Holbrook's son, Morgan, began training at Northrup's stable. Mrs. Holbrook, Samantha, and Morgan trained at Northrup's stable until 1979. During 1975 through 1979, petitioners became interested in starting a stable similar to Northrup's and discussed this interest with her. Northrup introduced petitioners to horse dealers. In addition, Mrs. Holbrook bought and read voluminous *392 writings with respect to horse breeding and training. Petitioners formed Holly Hill Farms, a horse breeding and training farm (the Farm), in April 1979. Under the tutelage of Northrup, petitioners purchased two horses, Peg O'Me Heart (Peg) and Max. In June 1979, petitioners moved their home and the Farm to approximately 40 acres of land in Killingworth, Connecticut. Mrs. Holbrook continued consulting with Northrup about horse training, horse care, and stables in general. In October 1979, Dr. Holbrook built a barn on the land with the assistance of his father-in-law. In 1983, Dr. Holbrook and his father-in-law extended the barn to accommodate additional stalls, a hayloft, and additional storage space. The property and barn were functional and not for show. The fences and the barn were unpainted. The barn was private and not visible from the main road. The Horses
Max was a 3-year-old gelding purchased for $ 1,250 and Peg was a 4-year-old broodmare purchased for $ 1,250. In 1981, petitioners purchased another gelding (Rebel) for $ 570. Petitioners bought Max and Rebel to train and sell at a profit; Max was sold in 1986 for $ 4,500. Petitioners purchased Peg to breed *393 as a quarter horse; they trained Peg before breeding her. In June 1982, petitioners unsuccessfully attempted to breed Peg. In 1982, petitioners purchased another broodmare, Redhead Judy. Redhead Judy, a thoroughbred, was previously a racing horse, and petitioners retrained Redhead Judy before breeding. In 1983, Peg and Redhead Judy were successfully bred to a stallion recommended by an adviser. The stallion had a respectable lineage and had a stud fee of $ 800 to $ 1,000. In 1984, the mares gave birth. Redhead Judy's foal was sold in 1988, but Peg's foal contracted a disease and died 2 months after birth. In 1985, Peg and Redhead Judy again were successfully bred; in 1986, each gave birth. One of the foals, however, was subsequently destroyed after contracting a disease. Also in 1985, petitioners leased a horse already in foal. In 1986, petitioners attempted to breed one of their mares by artificial insemination. In 1983, petitioners purchased a Shetland pony for $ 500; they sold the pony a few months later for $ 600. Petitioners also purchased two Welsh gelding ponies: (1) Tamarack Sel, a 12-year-old purchased for $ 400, and (2) Liseter Mister Fox, a 4-year-old thoroughbred *394 purchased for $ 6,000. [4] Petitioners sold Tamarack Sel in 1984 for $ 1,400 after petitioners' daughter Courtney earned a good reputation for the horse by showing him on the circuit. In 1984, petitioners purchased and attempted to sell two 4-year-old Welsh gelding ponies: (1) Dan Y Lan Deminuendo, purchased for $ 4,000, and (2) Dan Y Lan Merry Ronnie (Ronnie), purchased for $ 3,365. Both ponies were bought unbroken and had good bloodlines. Courtney trained and showed Ronnie. Mrs. Holbrook took Ronnie to a Florida show for wider exposure. To minimize expenses, Mrs. Holbrook, Samantha, and Courtney drove to Florida, towing the pony by trailer instead of shipping him commercially. In addition, Mrs. *395 Holbrook, Courtney, and Samantha stayed on the show grounds during the 2-1/2 weeks they were in Florida. Through this showing and petitioners' further efforts, Ronnie was subsequently sold for $ 5,500. [5]
At one point in 1986, petitioners had a total of 10 horses. Of these, seven were purchased, while three were foaled by petitioners' broodmares and sired by stallions owned by others. During the operation of the Farm, petitioners' mares and one leased mare collectively lost two foals to disease, had one spontaneous abortion, and delivered one stillborn. Petitioners' Efforts With the Horses
Mrs. Holbrook usually started work on the Farm at 5:30 a.m.; she cleaned the barn and cleaned, fed, groomed, and trained the horses. The children worked several hours a day riding and performing barn work; their weekends were spent showing *396 the horses. Petitioners and the children derived some pleasure from the activity in the warmer months, but found the activity unpleasant in the winter months. Petitioners showed their horses in various shows. Showing the horses made them more salable; the value of the horses would increase if they were successful on the show circuit. During the years at issue, petitioners' three children rode the horses at the shows. Mrs. Holbrook and the children worked long hours at the shows. [6]
Dr. Holbrook did not ride the horses. However, he performed routine medical care for them, such as giving vaccinations and administering prescription medications. Petitioners would call a veterinarian in cases of emergency, or if there was a problem with a foal. In addition, *397 Dr. Holbrook cleared and maintained the land, built and repaired the fences, worked in the barn, and occasionally took care of the horses. [7]
Mrs. Holbrook's riding of the horses during the years at issue was limited to "walking" them, after the children rode them, and putting them in their stables. Mrs. Holbrook was involved mainly with the training of the horses and barn maintenance. Petitioners enrolled some of their horses in clinics directed by well-known trainers in 1981, 1983, and 1984. Efforts To Sell the Horses
Petitioners' exhibited their horses in shows and advertised them for sale. Petitioners placed 17 such advertisements in 1984, 15 in 1985, and 10 in 1986 in a weekly publication featuring horses. These advertisements included offers to sell a gelding, *398 filly, ponies, mares, and horse equipment. Petitioners also advertised in local newspapers and in a second horse publication. Petitioners advertised all of their horses for sale at one time or another. Petitioners also contacted show barns and horse dealers who came to the Farm to see the horses. Petitioners took photographs and videos of the horses and mailed them out to potential buyers. Petitioners never refused a purchase offer for any of their horses. Businesslike Operation of the Farm
Petitioners retained Thomas Comer (Comer), a certified public accountant, to prepare their 1979 Federal income tax return. After petitioners discussed the Farm with Comer, Comer explained recordkeeping requirements to them. Petitioners kept business records detailing income and expenses [8] and, beginning in 1984, maintained a separate checking account for the Farm. Petitioners and Comer made informal projections of the results of operations. In 1984 and 1985, Comer assisted petitioners in determining the fair market value of their horses. *399 In 1987, petitioners discontinued the Farm. Petitioners sold some of the horses, gave some away, and kept two for the family. The Farm had operating losses from 1979 through 1986 as follows: Year
Gross Income
Expenses
(Loss)
1979
-0-
$  2,273
$ ( 2,273)
1980
-0-
7,093
( 7,093)
1981
-0-
9,396
( 9,396)
1982
$   15
17,127
(17,112)
1983
435
23,666
(23,231)
1984
1,708
26,039
(24,331)
1985
400
24,829
(24,429)
1986
4,690
20,380
(15,690)
Petitioners attributed these losses to poor market conditions for the sale of horses. Petitioners also pointed to other uncontrollable factors, such as the death of foals and unsuccessful breeding attempts. OPINION Respondent disallowed petitioners' deductions for their horse breeding, training, and sales activity, having determined that it was not an activity entered into for profit. Section 183 generally limits the amount of expenses that may be deducted with respect to an activity "not engaged in for profit". Sec. 183(a). For this purpose, an activity is "not engaged in for profit" if deductions are not allowable for the taxable year under section 162 or section 212(1) or (2). Sec. 183(c)
The test for determining *400 whether a taxpayer conducted an activity for profit is whether he or she entered into, or continued, the activity "with the actual and honest objective of making a profit". Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), affd. without opinion 702 F.2d 1205 (D.C. Cir. 1983). The taxpayer's expectation of profit need not be reasonable; however, he or she must have a good faith objective of making a profit. Allen v. Commissioner, 72 T.C. 28, 33 (1979); sec. 1.183-2(a), Income Tax Regs.
Whether petitioners engaged in their horse operation with the requisite profit objective is to be determined from the facts and circumstances of the case. Golanty v. Commissioner, 72 T.C. 411, 426 (1979), affd. without published opinion 647 F.2d 170 (9th Cir. 1981); sec. 1.183-2(a) and (b), Income Tax Regs. More weight is given to objective facts than to petitioners' statements of their intent. Sec. 1.183-2(a), Income Tax Regs. Petitioners bear the burden of proof. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). *401 The following factors, which are nonexclusive, aid in determining if an activity is engaged in for profit: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisers; (3) the time and effort expended by the taxpayer in carrying on the activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on other similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) elements of personal pleasure or recreation. Sec. 1.183-2(b), Income Tax Regs.
No single factor is determinative, Golanty v. Commissioner, supra at 426; sec. 1.183-2(b), Income Tax Regs., and a profit objective does not hinge on the number of factors satisfied, sec. 1.183-2(b), Income Tax Regs. A review of the entire record of this case in the context of these factors persuades us that petitioners engaged in the activity with the requisite profit motive. The following factors favor petitioners: The manner *402 in which petitioners carried on the activity; the expertise of petitioners or their advisers; the time and effort expended by petitioners in carrying on the activity; and the expectation that assets used in the activity may appreciate in value. The following factors are found to be neutral: Petitioners' history of income or loss from the activity and the activity's elements of personal pleasure or recreation. With respect to the manner in which petitioners carried on the activity, one indicium of an activity engaged in for profit is a taxpayer's businesslike conduct of an activity. Sec. 1.183-2(b)(1), Income Tax Regs. This includes the keeping of complete and accurate books and records. Id. Petitioners did so. Petitioners adopted a different breeding technique, artificial insemination, to maintain the Farm's breeding productivity; this is another indication of their profit motive. Sec. 1.183-2(b)(1), Income Tax Regs. Other indications of petitioners' businesslike manner were their attempt to minimize their expenses in an effort to increase profitability, and their advertisements and other sales efforts. With respect to the expertise of petitioners or their advisers, preparation *403 for an activity by extensive study of its practices or by consultation with experts may indicate that a taxpayer has a profit motive where the taxpayer follows such advice. Sec. 1.183-2(b)(2), Income Tax Regs. In this regard, petitioners sought and followed advice from successful horse breeders and trainers. Moreover, Mrs. Holbrook is an expert in the care, training, breeding, and showing of horses. In preparing for the activity, a taxpayer need not make a formal market study, but should undertake a basic investigation of the factors that would affect profit. Underwood v. Commissioner, T.C. Memo. 1989-625; Burger v. Commissioner, T.C. Memo. 1985-523, affd. 809 F.2d 355 (7th Cir. 1987). Based on the facts of this case, we conclude that petitioners made an adequate investigation. While petitioners did not conduct a formal market study, they did consult informally with their C.P.A., successful horse breeders, and trainers, all of which demonstrated their intent to engage in this activity for profit. See Engdahl v. Commissioner, 72 T.C. 659, 668 (1979) (although *404 no formal market study was conducted, petitioners' informal and continuous consultations with their trainer, other breeders, and veterinarians adequate to demonstrate profit motive). Another factor to consider is the time and effort expended by petitioners in carrying on the activity. Sec. 1.183-2(b)(3), Income Tax Regs. Based on the record, petitioners have demonstrated that the time and effort they devoted to the Farm was indicative of a profit motive. Another factor to consider is petitioners' expectation that assets used in the activity may appreciate in value. Sec. 1.183-2(b)(4), Income Tax Regs. Petitioners purchased all their geldings with the expectation that they would increase in value after they were trained and shown. With respect to petitioners' history of losses from the activity, losses continuing beyond the period customarily necessary to make the operation profitable, if not explainable, may indicate that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. All the same, a profit objective may exist despite a history of losses unaccompanied by any gains. Bessenyey v. Commissioner, 45 T.C. 261, 273-274 (1965), *405 affd. 379 F.2d 252 (2d Cir. 1967). Moreover, a series of losses at the beginning or startup stage of an activity does not mean that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs. In this regard, we note that the startup phase of an American saddle-bred breeding operation is 5 to 10 years, Engdahl v. Commissioner, supra at 669; Pirnia v. Commissioner, T.C. Memo. 1989-627, and the years at issue fall within this period. This factor does not indicate lack of a profit motive. [9]
With respect to elements of personal *406 pleasure or recreation, the regulations state that "The presence of personal motives in carrying on an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved". Sec. 1.183-2(b)(9), Income Tax Regs. However, the mere fact that a taxpayer derives personal pleasure from engaging in an activity does not, in and of itself, mean that the activity is not engaged in for profit if other factors show otherwise. Id. In the case at hand, the elements of recreation are not so great as to indicate that the activity was not engaged in for profit. Petitioners were not merely "horsing around"; the Farm demanded many hours of hard physical labor. While the family may have derived some pleasure from the activity, it was not enough to indicate a lack of a profit motive. [10]
Based on all the facts and circumstances of the case, we hold that petitioners *407 began and operated the Farm with the requisite profit objective during the years at issue. Accordingly, we sustain for each year petitioners' deductions relating to the Farm. Respondent determined additions to tax for negligence under section 6653(a) with respect to the Farm and the conceded automobile expenses, see supra note 3. Negligence under section 6653(a) is defined as lack of due care or failure to do what an ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). In light of our holding that the Farm was engaged in for profit, we need not address whether petitioners are liable for the additions to tax for negligence with respect to the Farm. Finally, we hold that petitioners were not negligent with respect to the additional automobile expenses when we view the whole record. To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Petitioners were originally represented by Nicholas J. Harding. Before trial, the Court allowed Mr. Harding to withdraw from the case.↩
1. This amount is 50 percent of the interest due on the deficiency.↩
2. With respect to the 1981 taxable year, the parties stipulated that respondent failed to issue a notice of deficiency to petitioners within the statutory period of limitations. See sec. 6501(a). Accordingly, the assessment or collection of any tax otherwise due for that year is barred by the statute of limitations, and we conclude there is no deficiency in 1981. Sec. 7459(e). Although petitioners did not raise the expiration of the statutory period of limitations in their petition, the parties expressly or impliedly raised this issue through a stipulation. See Rule 41(b). On brief, respondent conceded that petitioners have no deficiency for the 1981 taxable year.↩
3. Respondent's notice of deficiency included her determinations that petitioners may not deduct $ 2,462 and $ 3,137 of the amounts reported as automobile expenses on their 1982 and 1983 Federal income tax returns, respectively, and are liable for the additions to tax for negligence under sec. 6653(a)(1) and (2)↩ with respect to these deductions. Petitioners conceded these additional automobile expense deductions. However, as discussed below, we hold that petitioners are not liable for the additions to tax for negligence that respondent determined with respect to these amounts.
4. Petitioners purchased Liseter Mister Fox on the recommendation of one of their advisers. The horse was bought for training and resale. Liseter ponies generally have a good reputation and, by training the pony themselves, petitioners expected a large profit from an anticipated selling price of $ 10,000 to $ 20,000.↩
5. Petitioners advertised Ronnie in a weekly horse publication and sent videos to potential buyers. The purchaser of Ronnie contacted Mrs. Holbrook after seeing the advertisement.↩
6. Mrs. Holbrook generally started preparing the horses at 3 a.m. for transportation to the show, and the shows lasted until after dark. Following the show, Mrs. Holbrook and the children returned home, where they tended to and stabled the horses that were shown.↩
7. Dr. Holbrook cleared the land himself to reduce expenses; petitioners previously employed someone to clear the land for a riding lane, but it was becoming too expensive, so Dr. Holbrook bought a bulldozer and personally continued the work.↩
8. Respondent conceded that petitioners substantiated all claimed expenses with respect to their operation of the Farm.↩
9. We note that losses due to fortuitous circumstances such as depressed market conditions or disease are not an indication that the activity is not engaged in for profit. Sec. 1.183-2(b)(6), Income Tax Regs.↩ In the instant case, petitioners had difficulty breeding their mares and lost foals. Petitioners also had difficulty selling their horses because of bad market conditions.
10. We also note that the stables were not on petitioners' residential property as a "showcase".↩